Uldarico **LOZANO–GIRON**, Petitioner,

v.

**IMMIGRATION AND NATURALIZA- TION SERVICE**, Respondent.

No. 74–1260.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 12, 1974.

Decided Dec. 4, 1974.

**1074**

Nathan T. Notkin, Chicago, Ill., for petitioner.

James R. Thompson, U. S. Atty., Gary L. Starkman, Asst. U. S. Atty., Chicago, Ill., John L. Murphy, Chief, and Mary Jo Grotenrath, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before CASTLE, Senior Circuit Judge and STEVENS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

The primary isssue is whether a permanent resident alien's return to the United States from a 27-day trip to Colombia constituted an "entry" within the meaning of section 101(a)(13) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101(a)(13).[1]

---

1. 8 U.S.C. § 1101(a)(13) reads:

The term "entry" means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary: *Provided*, That no person whose departure from the United States was occasioned by deportation proceedings, extradition, or other legal process shall be held to be entitled to such exception.

## I

The petitioner is a 31 year old single male alien, a native and citizen of Colombia who was admitted to the United States for permanent residence at Miami, Florida, on October 25, 1963. He lived in the United States continuously since his entry in 1963 except for three visits to see his parents in Colombia: the first in April, 1970, for three months; the second in November, 1971, for three months; and the third from June 30, 1972 to July 27, 1972, when he returned to Miami as a returning resident. His purpose in going to Colombia for the third time was in order to get married, but his girl friend changed her mind and declined to marry him. He had with him on his trip in excess of $2,100 in currency.

The petitioner testified that inasmuch as he could not take Colombian currency out of that country, except for a nominal amount, and inasmuch as Colombian banks would not exchange Colombian currency for United States money, he had asked a friend to send him anyone who would exchange currencies with him. While he was in a dimly lit bar, a man approached him and agreed to take petitioner's 42,000 Colombian pesos (worth $2,100) plus petitioner's wrist watch, ring and a radio, in exchange for $2,400 in United States currency. The exchange was made and petitioner placed the $2,400 in a briefcase, which his mother put away in her home.

On July 27, 1972, petitioner took the briefcase with the money on the airplane with him as he departed for Miami, Florida. While on the plane, he decided to have a drink and was about to pay for it with a ten dollar bill from the briefcase when he noticed that it looked "kind of funny." Becoming nervous he went to the washroom and after satisfying himself that the entire $2,400 was counterfeit, he hid the money in his trouser pocket, shirt pocket and inside his belt. He testified that his intention at that time was to go to the Colombian consul when he reached Miami and seek his advice.

When petitioner reached Miami and went through customs, he was asked by a customs officer to pay a duty on a bottle of liquor. He asked permission to go to an international bank in the terminal in order to exchange his remaining 180 Colombian pesos into dollars. As he was about to leave, another customs officer stopped him, examined him and found the $2,400 in counterfeit money.

Petitioner was arrested and indicted. Upon his plea of guilty he was convicted in the United States District Court for the Southern District of Florida on November 6, 1972 of possessing, with intent to defraud, 204 counterfeit obligations of the United States in violation of 18 U.S.C. § 472. He was sentenced to 18 months' imprisonment and he served his sentence.

On May 8, 1973, petitioner was served with an order to show cause why he should not be deported from the United States. After holding a hearing where petitioner was represented by counsel of his choice, the Immigration Judge on July 12, 1973, ordered petitioner deported from the United States to Colombia, pursuant to section 241(a)(4) of the Immigration and Nationality Act in that he had been convicted of a crime involving moral turpitude committed within five years after entry and had been sentenced to confinement for a year or more. 8 U.S.C. § 1251(a)(4).[2]

On January 31, 1974, the Board of Immigration Appeals dismissed the petitioner's appeal. The case comes here on petition for review.

---

2. 8 U.S.C. § 1251 provides in part:

    (a) Any alien in the United States . . . shall, upon the order of the Attorney General, be deported who—

        \*      \*      \*      \*      \*

    (4) is convicted of a crime involving moral turpitude committed within five years after entry and either sentenced to confinement or confined therefor in a prison or corrective institution, for a year or more . . . ..

## II

■ Petitioner's first argument was that he was not convicted of "a crime involving moral turpitude."

He was indicted for possessing counterfeit obligations of the United States "with intent to defraud" in violation of 18 U.S.C. § 472.[3] Upon his plea of guilty, he was convicted of "possession of counterfeit obligations of the United States, knowing same to be counterfeit in violation of Title 18, United States Code, Section 472, as charged. . . ."

In Jordan v. DeGeorge, 341 U.S. 223, 227–28, 232, 71 S.Ct. 703, 706, 708, 95 L. Ed. 886 (1951), the Supreme Court said:

> Without exception, federal and state courts have held that a crime in which fraud is an ingredient involves moral turpitude. In the construction of the specific section of the Statute before us,[4] a court of appeals has stated that fraud has ordinarily been the test to determine whether crimes not of the gravest character involve moral turpitude. . . .
>
> In every deportation case where fraud has been proved, federal courts have held that the crime in issue involved moral turpitude. . . . In the state courts, crimes involving fraud have universally been held to involve moral turpitude.
>
> \* \* \* \* \* \*
>
> Fraud is the touchstone by which this case should be judged. The phrase "crime involving moral turpitude" has without exception been construed to embrace fraudulent conduct.

Intent to defraud is an element not only of the crime of bringing counterfeit obligations into the United States, to which petitioner would restrict that element, but also of the crime to which petitioner pleaded guilty—possession of counterfeit obligations. United States v. Wilkerson, 469 F.2d 963, 969 (5th Cir. 1972) cert. denied, 410 U.S. 986, 93 S.Ct. 1515, 36 L.Ed.2d 184 (1973); United States v. Leitner, 312 F.2d 107 (2d Cir. 1963). Thus, having pleaded guilty to a crime in which fraud is an element, petitioner was in fact convicted of "a crime involving moral turpitude."

## III

■ Petitioner's more substantial contention is that his return to the United States after a 27-day trip to Colombia did not constitute an "entry" within the meaning of 8 U.S.C. § 1101(a)(13).[5]

Entry means "*any* coming of an alien into the United States, from a foreign port . . .." The Immigration and Nationality Act of 1952 added an exception: "an alien having a lawful permanent residence in the United States" as did the petitioner here "shall not be regarded as making an entry . . . if . . . his departure to a foreign port . . . was not intended or reasonably to be expected by him or his presence in a foreign port . . . was not voluntary." 8 U.S.C. § 1101(a)(13).

The 1952 exception was a "codifying" of several cases decided shortly prior thereto:[6]

In Delgadillo v. Carmichael, 332 U.S. 388, 68 S.Ct. 10, 92 L.Ed. 17 (1947), there was no "entry" when an alien seaman, on an American ship bound from Los Angeles to New York which was torpedoed, was rescued and taken to Ha-

---

3. 18 U.S.C. § 472 provides (emphasis added):
   *Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both.*

4. Substantially the same statute as reenacted in the Immigration and Nationality Act of 1952 as 8 U.S.C. § 1251(a)(4). *See* note 2, *supra*.

5. *See* note 1, *supra*.

6. These cases are discussed in more detail in Rosenberg v. Fleuti, 374 U.S. 449, 454–58, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963).

vana, Cuba, to recuperate for a week before being returned to the United States at Miami, Florida.

In Di Pasquale v. Karnuth, 158 F.2d 878 (2d Cir. 1947), there was no entry when an alien went by sleeping car from Buffalo to Detroit upon a railroad whose route lay partially in Canada and who was asleep during the time the train was outside the United States and woke up in Detroit.

In Yukio Chai v. Bonham, 165 F.2d 207 (9th Cir. 1947), there was no entry when an alien returning from seasonal cannery work in Alaska to Seattle, Washington, was on a vessel which made an unscheduled stop of three hours at Victoria, British Columbia.

In Carmichael v. Delaney, 170 F.2d 239 (9th Cir. 1948), there was no entry where an alien returning from wartime service with the United States Maritime Service was aboard a vessel which had stopped at many foreign ports pursuant to Navy orders and finally reached the United States.

These cases made it fairly clear as to what was intended by the 1952 statutory language of a "departure to a foreign port . . . not intended or reasonably to be expected" or "presence in a foreign port . . . [which was] not voluntary."

In Rosenberg v. Fleuti, 374 U.S. 449 (1963), 83 S.Ct. 1804, 10 L.Ed.2d 1000, an exceptionally difficult situation had arisen. An alien homosexual entered the United States for permanent residence on October 9, 1952, a time when homosexuality did not render immigrants excludable. On December 24, 1952, the provision of the Immigration and Nationality Act of 1952 making "aliens afflicted with psychopathic personality, or sexual deviation, or mental defect" excludable, became effective (8 U. S.C. § 1182(a)(4)).[7] After being a

permanent resident for about four years, the alien visited Mexico in 1956 for "about a couple of hours." His return was considered an "entry" and he was ordered deported. The Court of Appeals for the Ninth Circuit set aside the deportation order on the ground that section 1182(a)(4) was unconstitutionally vague as applied to Fleuti. In a five-to-four decision, the Supreme Court held that the constitutional question could be avoided if Fleuti's return to the United States was not in fact an "entry;"[8] that Congress in 1952 intended "to ameliorate the severe effects of the strict 'entry' doctrine;"[9] and that the exception in 8 U.S.C. § 1101(a)(13) should be construed as constituting an "entry" only following "an intent to depart in a manner which can be regarded as meaningfully interruptive of the alien's permanent residence."[10] The Court then remanded the case to determine whether Fleuti's short trip to Mexico was taken with a meaningfully interruptive intent.

The Court suggested three major factors relevant to whether the requisite intent can be inferred:[11] (1) the length of time the alien is absent from the United States; (2) the purpose of the visit to the foreign port; and (3) "whether the alien has to procure any travel documents in order to make his trip, since the need to obtain such items might well cause the alien to consider more fully the implications involved in his leaving the country." The Court recognized that "other possibly relevant factors" remain to be developed "by the gradual process of judicial inclusion and exclusion."

Inasmuch as the Court was concerned with the "harsh consequence of the strict 'entry' doctrine,"[12] another group of relevant factors would undoubtedly center around the effect of the uprooting caused by deportation, that is, how long the alien had been a permanent res-

7. Rosenberg v. Fleuti, 374 U.S. 449, 453 n. 2, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963).

8. *Id.* at 451, 453, n. 2, 83 S.Ct. at 1812.

9. *Id.* at 461–62, 83 S.Ct. 1804.

10. *Id.* at 462, 83 S.Ct. at 1812.

11. *Id.*

12. *Id.* at 460, 83 S.Ct. at 1811.

ident of the United States, whether he had a wife and children living with him, whether he owned a business establishment or a home or other real estate in the United States, the nature of the environment to which he would be deported, and his relation to that environment.

Beginning with the *Fleuti* criteria, it should first be noted that considerable weight was given by the Supreme Court to the "about a couple hours" Mexican visit. It is variously characterized as "his afternoon trip," [13] "Fleuti's short visit to Mexico," [14] "a casual trip," [15] "innocent, casual, and brief" trip,[16] "just visiting," [17] and [18]

> [c]ertainly when an alien like Fleuti who has entered the country lawfully and has acquired a residence here steps across a border and, in effect, steps right back, subjecting him to exclusion for a condition for which he could not have been deported had he remained in the country seems to be placing him at the mercy of the "sport of chance" and the "meaningless and irrational hazards" to which Judge Hand alluded [in *Di Pasquale, supra*].

The Court, however, went on to say: [19]

> There are, of course, valid policy reasons for saying that *an alien* wishing to retain his classification as a permanent resident of this country *imperils his status by interrupting his residence too frequently or for an overly long period of time*, but we discern no rational policy supporting application

of a re-entry limitation in all cases in which a resident alien crosses an international border for a short visit.

In the present case, petitioner, instead of a "couple hours" absence from the country, was gone for 27 days.[20]  In a period of somewhat more than two years, he was absent on three occasions for a total of seven months.  This may under *Fleuti* be "too frequently or for an overly long period of time." [21]

The second *Fleuti* criterion is the purpose of the visit to the foreign port. The *Fleuti* opinion seems to provide two reasons for the importance of this guideline: (1) to determine "if the purpose of leaving the country is to accomplish some object which is itself contrary to some policy reflected in our immigration laws" or (2) to determine, in a broader sense, whether the intent to depart is "meaningfully interruptive of the alien's permanent residence." [22]

The most meaningful purpose would be departing with the intent to commit a crime or to violate immigration laws.[23] It would perhaps be equally meaningful if the illegal purpose was formed after departure but before return. Palatian v. Immigration and Naturalization Service, 502 F.2d 1091 (9th Cir. 1974).[24]  The record here does not show an illegal purpose either before departure or before return but, according to petitioner's testimony, while aboard the returning airplane.  *Fleuti*, however, does not limit the searching out of the purpose for

13.  *Id.* at 451, 83 S.Ct. 1804.

14.  *Id.* at 452, 83 S.Ct. 1804.

15.  *Id.* at 461, 83 S.Ct. 1804.

16.  *Id.*

17.  *Id.* at 463, 83 S.Ct. 1804.

18.  *Id.* at 460, 83 S.Ct. at 1811.

19.  *Id.* at 461, 83 S.Ct. at 1811 (emphasis added).

20.  Apparently the longest period involved in a case relying upon *Fleuti* was three weeks in Itzcovitz v. Selective Service Local Bd. No. 6, 447 F.2d 888 (2d Cir. 1971) where the alien sought and received a declaratory judgment that his trip to Tel Aviv, Israel, to attend a training course required by his em-

ployer, would not constitute an entry upon his return.

21.  If petitioner's return on any of these three occasions constituted an "entry," his November 6, 1972 conviction would fall within five years of the entry and render him deportable under 8 U.S.C. § 1251(a)(4).

22.  *Fleuti, supra* at 462, 83 S.Ct. at 1812.

23.  Martin-Mendoza v. Immigration & Naturalization Service, 499 F.2d 918, 922 (9th Cir. 1974).

24.  The court said: "The purpose, to smuggle marijuana into this country, is just as 'meaningful' if formed first in Mexico as it would be if first formed before going to Mexico." *Palatian, supra* at 1093.

leaving the country to the illegal purpose ultimately formed.

Here petitioner testified that he took his 27-day trip to Colombia to get married but the prospective bride changed her mind. In our view departing to get married is meaningfully interruptive of the alien's permanent residence. The possibilities of that purpose include two crucial ones, the bride might insist that the marital domicile be established in Colombia or somewhere other than the United States; or the bride might be an excludable alien under 8 U.S.C. § 1182 and the groom might elect to remain with the bride outside the United States. In other words when the petitioner left the United States on June 30, 1972, there was a substantial possibility that he would never return.

The petitioner's testimony regarding his procuring of the counterfeit money also raises questions as to whether the Colombian visit was meaningfully interruptive of his United States residence.

Inasmuch as petitioner testified that he knew or believed that Colombia does not permit a person to take more than a few dollars of Colombian currency out of that country and that Colombian banks will not exchange a traveler's Colombian money for United States currency, his possession of at least $2,100 worth of Colombian currency, which amount it must be presumed he brought with him from the United States, and which he converted into Colombian currency either in the United States or Colombia, tends to show an intent to remain in Colombia for a much longer period than he actually did, or perhaps indefinitely. Certainly no one would voluntarily place himself in a position where he would be forced to forfeit $2,100 if he did not resort to the black market in currency, unless he had changed his intent and returned to the United States earlier than originally planned, or perhaps instead of a prior plan not to return at all.

The remaining *Fleuti* criteria may be easily applied here.[25] The petitioner had lived in the United States for almost nine years prior to his July 27, 1972 entry. He had neither wife nor children living in the United States. The petitioner introduced no evidence as to any property or employment ties with the United States nor as to any dangers awaiting him in Colombia.[26]

Petitioner has relied principally upon three cases. In Zimmerman v. Lehmann, 339 F.2d 943 (7th Cir.), cert. denied, 381 U.S. 925, 85 S.Ct. 1559, 14 L. Ed.2d 683 (1965), we found no "entry" where the alien had been a resident of the United States for 39 years, was married to an American citizen, had three minor children born in this country, owned a business in Chicago and had taken the family on a one-week vacation trip to Canada.

In Vargas-Banuelos v. Immigration and Naturalization Service, 466 F.2d 1371 (5th Cir. 1972), the court found no "entry" where the alien, who had lived in the United States for seven years with his wife and four children, traveled to Mexico for two days to make a condolence call on the family of a deceased cousin. The alien while in Mexico became involved in aiding four Mexicans in entering the United States illegally. He was convicted but served no time in confinement and the federal court which

25. *Fleuti* refers to required "travel documents" without indicating what documents, if any, were required by Fleuti. In lieu of an immigrant visa, "an immigrant alien returning to an unrelinquished lawful permanent residence in the United States after a temporary absence abroad not exceeding 1 year may present Form I–151, Alien Registration Receipt Card, duly issued to him." 8 C.F.R. § 211.1(b). This requirement presumably would apply equally to a trip to Mexico or Colombia. However the general language in *Fleuti* quoted in this opinion, *supra*, seems to imply that an "across-the-border" trip to Mexico or Canada is of less consequence or meaning than a trip elsewhere.

26. In Palatian v. Immigration and Naturalization Service, 502 F.2d 1091, 1094 (9th Cir. 1974), the lower court considered that the alien would be deported to Communist Bulgaria. Nevertheless the court of appeals reversed and ordered deportation.

tried him recommended that he not be deported.

In Yanez-Jacquez v. Immigration and Naturalization Service, 440 F.2d 701 (5th Cir. 1971), the court found no "entry" where the alien, who had resided in the United States with his mother for about eight years, traveled to Mexico for two days for the purpose of revenging an earlier assault upon himself. He could not find his intended victim and he returned to the United States without committing any offense.

We find all three cases to be distinguishable in many respects. We therefore conclude that petitioner's return to the United States on July 27, 1972 constituted an "entry."

The petition for review is denied and the order of deportation is affirmed.