Ruben LONGORIA–CASTENADA,
Petitioner,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent.

No. 76–1147.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 10, 1976.

Decided Jan. 19, 1977.

234

Dale K. Irwin, The Legal Aid & Defender Society of Greater Kansas City, Inc., Kansas City, Mo., for petitioner; J. D. Riffel, The Legal Aid & Defender Society of Greater Kansas City, Inc., Kansas City, Mo., on brief.

John E. Harris, Atty., Dept. of Justice, Govt. Regulations & Labor Section, Crim. Div., Washington, D. C., for respondent; Philip Wilens, Chief, Govt. Regulations & Labor Section, Crim. Div., James P. Morris and Robert Kendall, Jr., Attys., Dept. of Justice, Washington, D. C., on brief.

Before GIBSON, Chief Judge, VAN OOSTERHOUT, Senior Circuit Judge, and HENLEY, Circuit Judge.

HENLEY, Circuit Judge.

Petitioner seeks reversal of an order issued by an Immigration Judge [1] that petitioner be deported from the United States to Mexico for violating the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(13),[2] in that, within five years after an entry into the United States, he knowingly and for gain aided and abetted other aliens to enter the United States illegally. The Board of Immigration Appeals dismissed petitioner's appeal, and he comes before this court pursuant to 8 U.S.C. § 1105a which sets forth the sole and exclusive procedure for judicial review. We affirm the order of deportation.

Petitioner Ruben Longoria-Castenada is a forty-seven year old male citizen of Mexico, duly admitted to the United States for permanent residence on August 14, 1957 at Hidalgo, Texas. He is employed, has eight children living at home, and his wife is a lawful permanent resident alien.

On October 23, 1974 the Immigration and Naturalization Service issued petitioner an order to show cause and notice of hearing charging that he was subject to deportation pursuant to 8 U.S.C. § 1251(a)(13) which requires proof of three elements: that petitioner assisted, aided or abetted other aliens to enter the United States illegally; that he acted for gain; and that he did so within five years after making an entry into the United States. The Service alleged that all of these transpired in March of 1971.

On March 14, 1971 petitioner travelled from his home in Liberal, Kansas to Deming, New Mexico where he was scheduled to have met with one Al Gutierrez to arrange for a rendezvous with some aliens petitioner was to haul from New Mexico to Flomot, Texas. When petitioner did not find Gutierrez on the United States side of the border, he crossed the border into Palomas,

Mexico to get something to eat and talk with Gutierrez if he could find him. Failing to locate Gutierrez, petitioner ate a meal and returned to the United States where he finally met with Gutierrez who led petitioner to a house in Columbus, New Mexico where the aliens were waiting. They paid petitioner $25.00 for gas. Petitioner put them in the back of his truck and started out for Texas where a Mr. Clyde was to pay him $100.00 for each alien. After driving about one-half hour, they were apprehended.

On March 15, 1971 petitioner was convicted on his plea of guilty in United States District Court in New Mexico for violation of 8 U.S.C. § 1325, for knowingly and unlawfully aiding and abetting others in the commission of a misdemeanor offense against the United States by illegal entry into this country; he was sentenced to thirty days. On March 16, during his incarceration, a sworn statement reciting the above story was taken from petitioner by United States Border Patrol Agents.

The deportation hearing was held in two parts on January 21 and March 18, 1975. Both the sworn statement as to the events and the Conviction, Judgment and Commitment relating to the § 1325 offense were admitted into evidence. Petitioner was the sole witness, and much of his testimony contradicted the facts related in his previously sworn statement. On the basis of this record, the Immigration Judge determined petitioner to be deportable under § 1251(a)(13), and the Board of Immigration Appeals dismissed his appeal.

■ In a case such as this, the scope of our judicial review is narrowly restricted. A determination by the Immigration and Naturalization Service can be overturned only where there is an abuse of discretion, lack of procedural due process, or where a

---

**1.** Thomas M. Ragno, Immigration Judge.

**2.** 8 U.S.C. § 1251(a)(13) provides:

 1251. Deportable aliens—General classes

 (a) Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—

 (13) prior to, or at the time of any entry, or at any time within five years after any entry, shall have, knowingly and for gain, encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law . . . ..

finding required by the statute is unsupported by reasonable, substantial or probative evidence. *Martin-Mendoza v. I&NS,* 499 F.2d 918, 920 (9th Cir. 1974). The standards for review are set by statute which provides that the findings of fact by the immigration judge must be accepted as valid and conclusive if they are supported by reasonable, substantial and probative evidence. 8 U.S.C. § 1105a, § 1252(b)(4).

 Petitioner's plea of guilty to the § 1325 offense established the first element required for deportation under § 1251 (a)(13), that petitioner knowingly aided and abetted other aliens to enter the United States in violation of law. *Cuevas-Cuevas v. I&NS,* 523 F.2d 883 (9th Cir. 1975). Petitioner's argument that this element was negated because the persons he aided were never proved to be illegal aliens has no merit. His conviction is a matter of record. Immigration authorities must look to the judicial record, and may not go behind it to make an independent determination of guilt or innocence. *Aguilera-Enriquez v. I&NS,* 516 F.2d 565, 570 (6th Cir. 1975). The court record of petitioner's Conviction, Judgment and Commitment under § 1325 was sufficient to prove that he had aided aliens in illegal activities within the meaning of the deportation provision.

 Similarly, petitioner's contention that the § 1325 conviction was improperly admitted into evidence at the deportation proceeding because it was not authenticated pursuant to Fed.R.Civ.P. 44 borders on the frivolous. A deputy clerk had certified that the record was a true copy of the original filed in the clerk's office. Although Rule 44 sets forth an acceptable standard for authenticating public records, the exacting requirements of judicial admissibility are not ordinarily applicable to administrative proceedings such as a deportation hearing except to the extent that due process is involved, which petitioner has not alleged here. *Maroon v. I&NS,* 364 F.2d 982, 986 (8th Cir. 1966); *United States v. O'Rourke,* 211 F.2d 609, 611 (8th Cir. 1954). Furthermore, upon specific questioning by the immigration judge who pointed out that the conviction record had been certified, counsel for petitioner withdrew his objection to its introduction into evidence and thus in effect abnegated petitioner's basis for appeal.

 The second element necessary for determination of a § 1251(a)(13) deportation, whether petitioner had acted for gain, became a matter of credibility when the petitioner testified that he had lied about the events related in his March 16 sworn statement. The immigration judge believed the evidence in the statement which indicated that petitioner had transported illegal aliens for gain. We accept this finding because it is supported by reasonable, substantial and probative evidence. 8 U.S.C. § 1105a.

 In addition we accept the immigration judge's finding as to the third element required under § 1251(a)(13), that petitioner's return from his brief excursion into Mexico on March 14 constituted an "entry" into the United States upon which deportation could be predicated.

The term "entry" is defined in 8 U.S.C. § 1101(a)(13) and includes a special provision for returning resident aliens based upon the intent of their departure from the United States.[3] This intent exception was construed in *Rosenberg v. Fleuti,* 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963), to mean that only a resident alien with an intent to depart the United States in a

---

**3.** 8 U.S.C. § 1101(a)(13) provides in pertinent part:

1101. Definitions
 (a) As used in this chapter—

 (13) The term "entry" means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary . . . ..

manner which can be regarded as "meaningfully interruptive" of his permanent residence will be exposed to the consequences of an "entry" into the country on his return. An innocent, casual, and brief excursion outside this country will not evoke the effects of an "entry" where the resident alien did not intend a departure disruptive of his resident alien status. 374 U.S. at 462, 83 S.Ct. 1804.

The criteria formulated to determine whether departure by a resident alien should be interpreted as a "meaningful interruption" of his resident alien status included, but was not limited to, the length of the absence, the procurement of travel documents and the purpose of the visit. *Id.* The Court observed that if the resident alien's purpose of leaving the country was to accomplish some object which is itself contrary to a policy reflected in our immigration laws, the interruption of the alien's residence would be properly regarded as "meaningful." *Id.*

In the case before us, the Immigration and Naturalization Service contends that petitioner's trip to Mexico was "meaningfully interruptive" of his permanent residence because it took place in furtherance of a scheme to assist illegal aliens. We agree.

Petitioner's sworn statement that he went to Mexico "to get something to eat and talk to Gutierrez if I could find him" indicates that petitioner left the United States for the purpose of participating in a meeting to advance a prearranged plan to aid and abet aliens who had entered the country illegally. By travelling to Mexico to speak with Gutierrez, petitioner attempted to expedite the execution of a master plan which provided for him to travel from his home in Kansas to New Mexico where he was scheduled to make contact with Gutierrez prior to transporting illegal aliens to Texas.

Although petitioner's brief crossing into Mexico required no travel documents, and his consumption of a meal while there was perfectly innocent, his intent in departing the United States was to pursue a course of action proscribed by immigration policy so as to convert his trip from a short, casual sojourn to a departure meaningfully disruptive of his resident alien status. *Cuevas-Cuevas v. I&NS, supra; Palatian v. I&NS,* 502 F.2d 1091 (9th Cir. 1974); *Solis-Davila v. I&NS,* 456 F.2d 424 (5th Cir. 1972); *cf. Vargas-Banuelos v. I&NS,* 466 F.2d 1371 (5th Cir. 1972).

The fact that petitioner's meeting with Gutierrez was not actually accomplished while he was in Mexico has little palliative effect. Petitioner's situation is distinguishable from the case he relies upon wherein it was determined there had been no "entry" on the return of a resident alien whose plan for revenge against an enemy in Mexico was aborted so that no offense was committed in either country. *Yanez-Jacquez v. I&NS,* 440 F.2d 701 (5th Cir. 1971). Here petitioner's intent to act in contravention of our immigration laws was formed before he left this country, remained operative during his presence in Mexico, and in fact reached fruition upon his return to the United States.

The intent that petitioner sustained until the offense which contravened immigration policy was finally committed removed his departure from this country from the "innocent, casual, and brief" ambit of *Rosenberg v. Fleuti, supra.* In the circumstances petitioner's purpose for going to Mexico made his departure one that was meaningfully disruptive of his resident alien status, and thus his return to this country properly constituted an "entry" within the meaning of 8 U.S.C. § 1101(a)(13). As a result, the final element necessary for deportation under § 1251(a)(13) was fulfilled.

We observe additionally that the effect of uprooting which would be caused by deportation has been recognized as a fourth relevant factor to be included in the *Fleuti* criteria for determining whether a departure from this country was intended to be meaningfully disruptive of a resident alien's status. *Lozano-Giron v. I&NS,* 506 F.2d 1073, 1077 (7th Cir. 1974). Here petitioner will be leaving a resident alien wife and eight children born in the United States

where he has legally lived for almost twenty years and has earned well-paying employment. And we note further that petitioner has been duly punished for his assistance to illegal aliens.

■ While we are unpersuaded on review that it was error to order deportation, we recognize that the sanction of deportation with its attendant hardships, both personal and familial, could be so harsh that petitioner's cause may commend itself for administrative relief. 8 U.S.C. § 1254(a)(1). Thus, while we affirm the order of deportation, we stay our mandate for sixty days to allow petitioner an opportunity to apply for discretionary administrative relief.

GIBSON, Chief Judge, dissenting.

I respectfully dissent. I find the Government's decision to bring deportation proceedings against petitioner to be based upon a hypertechnical interpretation of our immigration laws, which exhibits gross insensitivity to a resident alien of twenty years and to his large family of United States citizens.

In drafting the statute applied to effect petitioner's deportation, Congress expressed the clear intent to ameliorate "the harsh results" which had previously befallen resident aliens. *Rosenberg v. Fleuti,* 374 U.S. 449, 458, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963). In recognition of this ameliorative intent, the Supreme Court has refused to fossilize the term "entry" as used in 8 U.S.C. § 1101(a)(13) (1970) by rigid definition. Instead, it has preferred a flexible approach, which permits a court faced with a question of interpretation of "entry" under § 1101(a)(13) to consider and balance a variety of relevant factors. "Given that the congressional protection of returning resident aliens in [§ 1101(a)(13)] is not to be woodenly construed", the Court declined to reduce these factors to a closed or definitive list and left the development of other possibly relevant factors to the "gradual process of judicial inclusion and exclusion." *Rosenberg v. Fleuti,* 374 U.S. at 460, 462, 83 S.Ct. 1804, 1811, 1812. The most significant factor to be so added since *Fleuti* has been that

of the impact of deportation upon a particular alien. In recent decisions, a consideration of the effect of deportation upon an individual has been deemed integral to a proper implementation of our immigration laws either explicitly, *Lozano-Giron v. Immigration and Naturalization Service,* 506 F.2d 1073, 1077–78 (7th Cir. 1974), or *sub silentio, Vargas-Banuelos v. Immigration and Naturalization Service,* 466 F.2d 1371 (5th Cir. 1972); *Yanez-Jacquez v. Immigration and Naturalization Service,* 440 F.2d 701 (5th Cir. 1971).

The Supreme Court has recognized that "[t]he stakes are indeed high and momentous for the alien who has acquired his residence here", *Rosenberg v. Fleuti,* 374 U.S. at 458, 83 S.Ct. at 1810, *quoting Delgadillo v. Carmichael,* 332 U.S. 388, 391, 68 S.Ct. 10, 92 L.Ed. 17 (1947). In light of the legislative history of § 1101(a)(13) and the Supreme Court's interpretation of this provision, I believe that a consideration of the effect of deportation upon a particular alien is a factor that should be considered in determining whether an "entry" has been effected. This is especially imperative where, as here, it was unnecessary to procure travel documents and there is no evidence of any intent to leave the country for more than a brief interlude, such as an hour for lunch, or of a meaningful departure. Concededly there was no intention on petitioner's part to abandon his alien residency of many years when he crossed the Mexican border for lunch.

The potential effect of deportation in the present case is indeed lamentable. In departing from this country, Longoria-Castenada will leave behind him eight children, all United States citizens, a wife who is a lawful permanent resident alien and the employment whereby he has successfully supported this large family. Petitioner committed an offense for which he was duly punished. I am dismayed at the Government's decision to parlay a one hour lunch trip across the border into the basis of the instant deportation proceedings. The instigation of these proceedings epitomizes

a mechanical and inhumane application of our immigration laws.

I agree with the majority that the facts of this case pertaining to petitioner's intent are distinguishable from those underlying other decisions where no "entry" was found. I do not believe, however, that § 1101(a)(13) requires that petitioner's intent be weighed more heavily than other relevant factors. A balancing of all relevant factors, including the impact of deportation upon petitioner, convinces me that the order of deportation here is inconsonant with both the letter and spirit of our immigration laws.

I would reverse the deportation order.