Alfredo **YANEZ–JACQUEZ, Petitioner,**

v.

**IMMIGRATION AND NATURAL-
IZATION SERVICE et al.,
Respondents.**

**No. 30069.**

United States Court of Appeals,
Fifth Circuit.

March 19, 1971.

Jones, Circuit Judge, dissented and filed opinion.

Albert Armendariz, El Paso, Tex., for petitioner.

John N. Mitchell, Atty. Gen. of U. S., U. S. Dept. of Justice, Washington, D. C., Troy A. Adams, District Director, U. S. Immigration and Nat., New Orleans, La., John W. Holland, District Director, San Antonio, Tex., Hugh P. Shovlin, James Gough, Asst. U. S. Attys., Houston, Tex., Seagal V. Wheatley, U. S. Atty., San Antonio, Tex., for respondents.

Before JONES, BELL and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

We here review a deportation order of the Immigration and Naturalization Service. Title 8, U.S.C., Section 1105a. We conclude that the deportation order was not in accordance with established law. We grant the petition for review and vacate and set aside the order of deportation.

The petitioner, Alfredo Yanez-Jacquez, enjoyed the status of a permanent resident alien. He was lawfully admitted to the United States for permanent residence on July 19, 1955, and thereafter resided in El Paso, Texas, with his mother.

On or about May 4–5, 1963, while the petitioner was on a brief trip across the international border to Juarez, Mexico, he was assaulted and robbed. The next day he decided to seek revenge upon his

assailants, armed himself with an ice-pick and re-entered Juarez. His search was unsuccessful and because of the presence of numerous Juarez police officers, he recrossed the Rio Grande River at a point about one-half mile from the Sante Fe Bridge. While Yanez-Jacquez sat on the river bank, on the American side, hoping for his assailants to appear, he was apprehended by officers of the U. S. Border Patrol and taken to a port of entry. Petitioner's mother was contacted and she brought the petitioner's Border Crossing Identity Card to him at the Immigration Office. This identification card satisfied the officials that petitioner had been lawfully admitted to this country for permanent residence, and petitioner was allowed to leave without further incident. Petitioner was then taken into custody by the El Paso police because he had the icepick in his possession, but was shortly thereafter released.

On January 11, 1968, in the 34th Judicial District Court of El Paso, Texas, petitioner was tried and convicted for uttering a forged instrument. He was sentenced to two years confinement. The sentence was suspended and Yanez-Jacquez was placed on adult probation for a period of two years. On June 7, 1968, an order was issued by the same court revoking the probation and ordering the petitioner to serve two years in the state penitentiary.

The United States then sought deportation under Section 241(a) (4) of the Immigration and Naturalization Act, Title 8, U.S.C., § 1251(a) (4). In pertinent part that statute provides:

1251. Deportable aliens—General classes

(a) Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—

\*   \*   \*   \*   \*   \*

(4) is convicted of a crime involving moral turpitude committed within five years after entry and either sentenced to confinement or confined therefor in a prison or corrective institution, for a year or more, or who at any time after entry is convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefore and regardless of whether the convictions were in a single trial;.

After hearing before the Special Inquiry Officer, the petitioner was ordered deported to Mexico. The short visit across the border in May 1963 was construed as his entry. On January 16, 1970, the Board of Immigration Appeals affirmed the decision of the Special Inquiry Officer. This petition for review of the administrative proceedings followed.

The petitioner raises three points before us:

I. Did petitioner receive a fair hearing before the Special Inquiry Officer?

II. Did petitioner make an "entry" within the contemplation of the Immigration Laws on which deportability can be predicated?

III. Did the Special Inquiry Officer and the Board of Immigration Appeals correctly interpret the requirements of Section 241 (a) (4) of the Immigration and Nationality Act, 8 U.S.C. 1251 (a) (4), as requiring only commission, and not conviction of a crime within five years of entry?

We have determined that Yanez-Jacquez's border crossing of May 6, 1963, did not constitute an "entry" into the United States, as that term is employed by Title 8, U.S.C., § 1251(a) (4). Accordingly, we find it necessary to discuss only the second point raised, and will not refer further to the other two arguments presented.

Requisite to a successful deportation proceeding under Title 8, U.S.C., § 1251(a) (4) is a finding that the alien is convicted of a crime *committed within five years after entry*. The critical

question here is what constitutes an "entry" under the statute. The government's position, as noted, is that an "entry" within the purview of the statute took place during the May 16, 1963, border crossing incident related earlier. The petitioner's position is that the border crossing after the brief trip to Juarez was not an "entry" within the meaning of the statute.

At surface level, the statutory definition of "entry" would seem to include the petitioner's May 16, 1963 border crossing. In Title 8, U.S.C., § 1101(a)(13) "entry" is defined to mean "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntary or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary". However, this statutory definition has received relevant and critical judicial gloss in the case of Rosenberg v. Fleuti, 1963, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000. The facts in *Fleuti* resemble those in the instant case. Fleuti was a Swiss national who was originally admitted to this country for permanent residence in 1953, and had lived in the United States continuously except for a visit of "about a couple hours" in Mexico in 1956. The Court there held that an innocent, casual, and brief excursion by the resident alien outside the country was not a departure intended to be disruptive of the alien's resident status so as to subject him to the consequences of an "entry" upon return to this country.

The Court indicated noticeable concern over the numerous reported cases demonstrating the harsh result flowing from a strict reading of the statutory "entry" definition, and stated:

"There are, of course, valid policy reasons for saying that an alien wishing to retain his classification as a permanent resident of his country imperils his status by interrupting his residence too frequently or for an overly long period of time, but we discern no rational policy supporting application of a re-entry limitation in all cases in which a resident alien crosses an international border for a short visit. Certainly if that trip is innocent, casual, and brief, it is consistent with all the discernible signs of congressional purpose to hold that the 'departure * * * was not intended' within the meaning and ameliorative intent of the exception to § 101(a)(13). Congress unquestionably has the power to exclude all classes of undesirable aliens from this country, and the courts are charged with enforcing such exclusion when Congress has directed it, but we do not think Congress intended to exclude aliens long resident in this country after lawful entry who have merely stepped across an international border and returned in 'about a couple hours'. Such a holding would be inconsistent with the general purpose of Congress in enacting § 101(a)(13) to ameliorate the severe effects of the strict 'entry' doctrine." 374 U.S. at 461, 83 S.Ct. at 1811, 10 L.Ed.2d at 1008.

Justice Goldberg, speaking for the Court, attempted to formulate criteria for determining whether departure by a resident alien should be interpreted as a meaningful interruption of his resident status so as to visit the consequences of an "entry" upon him on his return to the country:

"We conclude, then, that it effectuates congressional purpose to construe the intent exception to § 101(a)(13) as meaning an intent to depart in a manner which can be regarded as meaningfully interruptive of the alien's permanent residence. One major

factor relevant to whether such intent can be inferred is, of course, the length of time the alien is absent. Another is the purpose of the visit, for if the purpose of leaving the country is to accomplish some object which is itself contrary to some policy reflected in our immigration laws, it would appear that the interruption of residence thereby occurring would properly be regarded as meaningful. Still another is whether the alien has to procure any travel documents in order to make his trip, since the need to obtain such items might well cause the alien to consider more fully the implications involved in his leaving the country. Although the operation of these and other possible relevant factors remains to be developed 'by the gradual process of judicial inclusion and exclusion', Davidson v. New Orleans, 96 U.S. 97, 104, 24 L.Ed. 616, [619], we declare today simply that an innocent, casual, and brief excursion by a resident alien outside this country's borders may not have been 'intended'· as a departure disruptive of his resident alien status and therefore may not subject him to the consequences of an 'entry' into the country on his return." 374 U.S. at 463, 83 S.Ct. at 1812, 10 L.Ed.2d at 1008–1009.

The government urges that the language "*innocent, casual, and brief excursion*" is critical, and distinguishes this case from *Fleuti*. The argument is that petitioner's trip to Mexico was anything but innocent, that in attempting to use self-help to avenge his robbery he left the country with the purpose of committing an act which is contrary to the policies of the immigration laws.[1] We agree that petitioner's purpose was less than salutary in nature. We disagree,

however, that this one factor is controlling. We think that application of the other factors outlined in *Fleuti* point markedly to a conclusion that the petitioner did not intend by the trip to Juarez to interrupt his status as a resident alien. The duration of the trip was short and for a single purpose. It had been the habit of petitioner to go often to Mexico for brief visits. Each time, however, he returned to the United States and appeared outwardly to regard this country as his permanent residence. The petitioner had procured a Border Crossing Identity Card to facilitate trips to Mexico and back although he failed to carry this document with him on May 6, 1963 when he returned to the United States side of the border. In short, we conclude that there is less than adequate evidence in the record to support a finding that the petitioner left the country with the intent to interrupt in any meaningful manner his status as a permanent resident alien.

This case is necessarily limited to its facts. A different set of facts applied to the criteria to be weighed might dictate a different result. See, e. g., Gamero v. Immigration and Naturalization Service, 9 Cir. 1966, 367 F.2d 123; Zimmerman v. Lehmann, 7 Cir. 1965, 339 F.2d 943; Wadman v. Immigration and Naturalization Service, 9 Cir. 1964, 329 F.2d 812. Under the facts of this case, we simply conclude that the agency determination that the incident of May 6, 1963, was an "entry" does not have support in the record.

The petition is granted; the deportation order is vacated and set aside and its enforcement enjoined.

JONES, Circuit Judge, dissenting:

The stay of Yanez-Jacquez was brief and perhaps it was casual, but when he

---

1. The government's own brief reflects that motivation during the petitioner's May 16, 1963, visit to Juarez is the only plausible grounds upon which to distinguish this case from *Fleuti*. Although the government notes that petitioner made twice-a- week trips to Mexico during 1963, or about 100 trips during the year, none of these other departures and returns to the United States are argued as "entries" which would subject the petitioner to deportation.

went across the border with the icepick in search of someone on whom the icepick was to be used, I cannot agree that the visit was innocent.  I do not think Rosenberg v. Fleuti applies.  I would let the order of deportation be enforced.  I dissent.