Antonio VARGAS–BANUELOS,
Petitioner,

v.

IMMIGRATION AND NATURALIZA·
TION SERVICE, an Agency of the
United States Government and Its Di·
rector, the Attorney General of the
United States, Respondent.

No. 72–1159.

United States Court of Appeals,
Fifth Circuit.

Sept. 14, 1972.

Robert L. Millard, Kent R. Morrison, El Paso, Tex., for petitioner.

John N. Mitchell, Atty. Gen., U. S. Dept. of Justice, Washington, D. C., Troy A. Adams, Jr., District Dir., Immigration and Nat. Service, New Orleans, La. and District Director, Immigration & Nat. Service, El Paso, Tex., William S. Sessions, U. S. Atty., San Antonio, Tex., Ralph E. Harris, Asst. U. S. Atty., El Paso, Tex., for respondent; William E. Weinert, Trial Atty., Immigration and Naturalization Service, El Paso, Tex., of counsel.

Before BELL, GOLDBERG and RO-NEY, Circuit Judges.

GOLDBERG, Circuit Judge:

In this case, the Government, seeking an expansive interpretation of the deportation laws, asks us to affirm the order of the Immigration and Naturalization Service (INS) deporting petitioner. Although the Government's argument has some merit, we are bound by the philosophy and wisdom of the Supreme Court's decision in Rosenberg v. Fleuti, 1963, 374 U.S. 449, 83 S.Ct. 1804, 10 L. Ed.2d 1000, and we therefore reverse and set aside the order of deportation.

Petitioner is a 41 year old Mexican national who was duly admitted to the United States as a permanent resident in 1963. Since that time he has resided in Colorado with his wife and four children, the youngest of whom is a native born United States citizen. The record shows that on or about April 2, 1970, petitioner traveled from Colorado to Juar-

ez, Mexico, to pay a condolence call on the family of a cousin who had recently passed away. On or about April 4, 1970, prior to departing from Juarez petitioner was approached by four Mexicans who sought his aid in effecting an illegal entry into the United States and in procuring transportation to Chicago after the entry. While the precise details of petitioner's involvement remain uncertain, it is clear that petitioner accepted money from the four aliens and made arrangements with a third party to meet the four men in El Paso, Texas, where they would be assisted in their journey northward. There was no evidence in the record of any knowledge or intention on the part of petitioner to engage in this activity prior to the moment when he was first approached by the four aliens in Juarez.

All of the parties to this scheme were apprehended by United States immigration officers in Texas after crossing the border. On April 9, 1970, the petitioner, appearing before the United States District Court for the Western District of Texas, pleaded guilty to four counts of aiding and abetting the four Mexicans in entering the country illegally. On July 9, 1970, he was sentenced to concurrent sentences of six months on each of the four counts, with sentences being suspended on the last three counts and petitioner being placed on probation for a term of five years. The district court later amended its original judgment by adding a recommendation to INS that the petitioner not be deported. Nevertheless, INS thereafter instituted proceedings to deport petitioner under 8 U. S.C.A. § 1251(a)(13), which provides:

"(a) Any alien in the United States . . . shall, upon the order of the Attorney General, be deported who—

\*　\*　\*　\*　\*　\*

(13) prior to, or at the time of any entry, or at any time within five years after any entry, shall have,

knowingly and for gain, encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law. . . ."

The special inquiry officer rendered his decision deporting petitioner on November 2, 1970, and the decision was upheld by the Board of Immigration Appeals on December 6, 1971. From that decision petitioner brings this appeal.

█ The primary focus of petitioner's legal claim revolves around that part of the statute that requires that the illegal behavior take place "prior to, or at the time of . . . or . . . within five years after any *entry*." This requirement of an "entry," simple enough on its face, has become a term of art in judicial circles. Owing to the harsh results that can flow from a finding of an "entry" in a deportation case, particularly in cases where the entry was the result of a short or inadvertent departure from the United States,[1] Congress, in 1952, added the following section to the statute defining the term "entry":

"(13) The term 'entry' means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, *except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary: Provided,* That no person whose departure from the United States was occasioned by deportation proceedings, extradition, or other legal

---

1. The history and evolution of the term "entry" is traced by the Supreme Court in Rosenberg v. Fleuti, *supra. See also*

H.R.Rep. No. 1365, 82nd Cong. 2d Sess. 32 (1952) ; S.Rep. No. 1137, 82nd Cong. 2d Sess. 4.

process shall be held to be entitled to such exception."

8 U.S.C.A. § 1101(13) [emphasis added].

The judicial landmark for interpreting this provision came in the Supreme Court's decision in Rosenberg v. Fleuti, *supra*. There the Court read the "entry" requirement so as to prevent the situation whereby a resident alien subjects himself to deportation based on an "entry" into the United States when the entry relied on by the Government is nothing more than a return from a short visit outside the country, made without any intention on the part of the resident alien of abandoning his resident status. Speaking for the Court, Justice Goldberg stated:

> ". . . we declare today simply that an innocent, casual, and brief excursion by a resident alien outside this country's borders may not have been 'intended' as a departure disruptive of his resident alien status and therefore may not subject him to the consequences of an 'entry' into the country on his return."

374 U.S. at 462, 83 S.Ct. at 1812, 10 L. Ed.2d at 1009.

In determining whether the alien "intended" to interrupt his residential status the *Fleuti* court established various relevant factors to be considered, including length of absence from the United States,[2] the need to obtain special travel documents, and the purpose of the visit. It is the third factor, purpose for the visit, that the Government urges upon us as the basis for saying that an entry took place. In *Fleuti*, the Court said:

> ". . . if the purpose of leaving the country is to accomplish some object which is itself contrary to some policy reflected in our immigration laws, it would appear that the inter-

ruption of residence thereby occurring would properly be regarded as meaningful."

374 U.S. at 462, 83 S.Ct. at 1812, 10 L. Ed.2d 1008–1009.

In deciding whether the foregoing passage is dispositive of the case, two recent cases decided by this court are instructive. In Yanez-Jacquez v. INS, 5 Cir. 1971, 440 F.2d 701, the critical "entry" was based on the petitioner's brief journey into Mexico, armed with an icepick, with the express intent of avenging an earlier assault. Despite a rather clear finding of criminal purpose when departing the country, the court refused to find petitioner's return to the United States to be an "entry" within the meaning of the statute:

> ". . . We agree that petitioner's purpose was less than salutory in nature. We disagree, however, that this one factor is controlling. We think that application of the other factors outlined in *Fleuti* point markedly to a conclusion that the petitioner did not intend by the trip to Juarez to interrupt his status as a resident alien."

440 F.2d at 704.

In Solis-Davila v. INS, 5 Cir. 1972, 456 F.2d 424, this court, on facts similar to our case, found petitioner's return to the United States while smuggling aliens into the country to be an "entry" within the meaning of 8 U.S.C.A. § 1101(a)(13) and upheld the deportation. Unlike the instant case, however, in *Solis-Davila* there was a specific finding that petitioner left the United States "for the express purpose of unlawfully smuggling several aliens into this country." 456 F.2d at 427. Here the Government admits there was no evidence of criminal purpose when petitioner departed, and the only evidence presented on

---

2. Petitioner's two-day visit is clearly not, under the case law, indicative of an intention to abdicate residential status. Itzcovitz v. Selective Service Local Bd. No. 6, 2 Cir. 1971, 447 F.2d 888 (return after three week absence not an entry); Wadman v. INS, 9 Cir. 1964, 329 F.2d 812 (five days); Zimmerman v. Lehmann, 7 Cir. 1965, 339 F.2d 943, cert. denied, 381 U.S. 925, 85 S.Ct. 1559, 14 L.Ed.2d 683 (five or six days).

the issue indicates that the purpose of the trip was to make a condolence call.

While the line between *Solis-Davila* and this case—whether the criminal purpose was formed prior to or after departure—appears to be a fine one, we feel that both the spirit and letter of *Fleuti* and *Yanez-Jacquez* demand that it be drawn in cases such as this. The lesson of *Fleuti* is that a brief departure from this country should not give rise to grounds for deportation when the alien returns unless some element of the alien's state of mind *at the time of the departure* subjected him to the charge that he left the country with the intention to interrupt his residential status. Any other holding would make a mockery of *Fleuti's* humanities. Unless our immigration laws receive a compassionate interpretation and concomitant administration, our country will no longer be the haven inscribed upon the Statue of Liberty for the huddled masses, tired and poor, yearning to breathe free.

While we cannot condone petitioner's criminal activity in this case, he has been tried and convicted of his crimes in federal court and the further sanction of deportation with all of its familial and other hardships, should not be imposed unless clearly authorized by the statute. Let us not exalt every migrant's deviation from rectitude into illegal "entries" within the statutory definition. *Solis-Davila* should not be stretched beyond its facts, lest *Fleuti* become a legal desuetude. Our immigration laws do not require the rigoristic rigidity urged upon us by the Immigration and Naturalization Service. Under *Fleuti* and its progeny in this circuit, the failure of the Government to show a criminal purpose prior to petitioner's departure is fatal to its case. Being unable to find an "entry" within the meaning of the statute, we cannot allow the deportation to stand. The petition is therefore granted, the deportation order vacated, and its enforcement enjoined.

Reversed.