**Jesus Manuel LAREDO–MIRANDA, a/k/a Raul Laredo-Miranda, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE etc., et al., Respondents.**

No. 76–3008.

United States Court of Appeals, Fifth Circuit.

July 13, 1977.

Ralph R. Garcia, El Paso, Tex., for petitioner.

Rex L. Young, James P. Morris, Philip Wilens, Attys., Crim. Div., Dept. of Justice, Washington, D.C., for respondents.

Before WISDOM, GEE and FAY, Circuit Judges.

GEE, Circuit Judge:

Petitioner Laredo-Miranda was an 18-year-old resident alien in this country when he assisted five illegal aliens in wading across the Rio Grande River into Texas. He was arrested shortly thereafter and made the subject of deportation proceedings; an immigration judge ordered his deportation, and the Board of Immigration Appeals affirmed.[1] Laredo-Miranda's petition requires our examination of *Rosenberg v. Fleuti,* 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963), and its progeny within this Circuit, to determine whether under the circumstances his surreptitious crossing of the river constitutes an "entry" into this country under the Immigration and Nationality Act.

According to his uncontradicted testimony, Laredo-Miranda entered Juarez, Mexico, on August 16, 1975, for the sole purpose of having a meal with his girl friend and her family; he knew that his companion, one Luis Salas, intended to bring a group of aliens back across the border, but did not intend to take part in the actual smuggling.[2] While in Juarez, Laredo-Miranda discovered that he had left his alien registration card at his home in Anthony, New Mexico. Rather than take the time and trouble to present himself at the border and wait for someone to bring his card, he decided to wade the river with the group of aliens. Salas recrossed legally at a bridge, and Laredo-Miranda went to the riverbank with the rest of the group. A Border Patrol agent watched from cover as Laredo-Miranda waded completely across the Rio Grande, then returned to the Mexican side, and finally crossed once again into Texas, this time leading the illegal aliens with him.[3] By this time Salas had arrived with his car, and the entire entourage loaded up, only to be stopped a short distance away by Border Patrol officers.[4]

The Immigration and Naturalization Service (INS) seeks to deport Laredo-Miranda on the authority of § 241(a)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2) (1970), which renders deportable any alien who

> entered the United States without inspection or at any time or place other than as designated by the Attorney General or is

---

1. The Board modified the immigration judge's order to allow voluntary departure rather than deportation.

2. The group included Salas's wife and Laredo-Miranda's girl friend, who were sisters, and their mother. The INS does not contest Laredo-Miranda's assertion that he had no intention of participating in the illegal crossing when he first entered Juarez.

3. The officer testified that Laredo-Miranda's first trip across was a noisy one, waving his arms and splashing the water, and that this was a common tactic employed by a "pathfinder" before bringing his charges across the river. We surmise that Laredo-Miranda may have sought to attract the attention of any officers in the area so that if any arrests were made, only one person—a lawful resident alien, at that—would suffer arrest, rather than the entire group. Thinking he was undiscovered, he then returned to bring the rest of the group.

4. When arrested, Laredo-Miranda gave the officers a fictitious name, birthdate, and destination, in hopes that he would simply be returned to Mexico and could then re-enter the United States under his correct identity.

in the United States in violation of this chapter or in violation of any other law of the United States. . . .

Although he concededly crossed the river "without inspection," Laredo-Miranda is subject to deportation under § 241(a)(2) only if by doing so he "entered" the United States, as the Act defines that term. In § 101(a)(13) of the Act, 8 U.S.C. § 1101(a)(13), an otherwise broad definition of "entry" is constricted for application to legally resident aliens:

> [A]n alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place . . . was not intended or reasonably to be expected by him or his presence in a foreign port or place . . . was not voluntary. . . .

The Supreme Court in *Rosenberg v. Fleuti,* fleshing out the "intent" exception of § 101(a)(13), held that a resident alien's departure can be considered to have been "intended" only if he possessed "an intent to depart in a manner which can be regarded as meaningfully interruptive of the alien's permanent residence." 374 U.S. at 462, 83 S.Ct. at 1812, 10 L.Ed.2d at 1008. Fleuti, a Swiss national and a homosexual, had resided in this country for four years when he visited Ensenda, Mexico, for about two hours; three years later the INS moved for his deportation under §§ 212(a)(9) and 241(a)(1), alleging that he had been excludable at the time of his last "entry" because of his homosexuality. Reversing his deportation order and remanding for further consideration, the Court held that

> an innocent, casual, and brief excursion by a resident alien outside this country's borders may not have been 'intended' as a departure disruptive of his resident alien status and therefore may not subject him to the consequences of an 'entry' into the country on his return. The more civilized application of our immigration laws . . . protects the resident alien from

unsuspected risks and unintended consequences of such a wholly innocent action.

*Id.* at 462, 83 S.Ct. at 1812, 10 L.Ed.2d at 1009. Suggested factors for evaluating whether a departure carries the necessary intent include the length of the visit, whether travel documents were required, and

> the purpose of the visit, for if the purpose of leaving the country is to accomplish some object which is itself contrary to some policy reflected in our immigration laws, it would appear that the interruption of residence thereby occurring would properly be regarded as meaningful.

*Id.* at 462, 83 S.Ct. at 1812, 10 L.Ed.2d at 1008–09. The Court indicated, however, that its list of such factors was not exhaustive:

> [T]he operation of these and other possibly relevant factors remains to be developed 'by the gradual process of judicial inclusion and exclusion,' . . . . .

*Id.* at 462, 83 S.Ct. at 1812, 10 L.Ed.2d at 1009.

Building upon *Fleuti,* a panel of this Circuit held in *Yanez-Jacquez v. INS,* 440 F.2d 701 (5th Cir. 1971), that a resident alien's departure into Juarez with an ice pick to avenge an earlier assault and robbery was not a "meaningful departure," and thus that Yanez-Jacquez did not "enter" this country when he discovered, after failing to carry out his mission of vengeance, that he had left his alien registration card in the United States, and waded back across the river. His purpose in departing was "less than salutory," *id.* at 704, but his trip lasted only a few hours, and he had in the past made a number of short trips into Mexico, each time returning to the United States as his apparent intended home. These latter facts outweighed his illicit purpose and required the conclusion that he did not intend to "interrupt in any meaningful manner his status as a permanent resident alien." *Id.* We later held, in *Vargas-Banuelos v. INS,* 466 F.2d 1371 (5th Cir. 1972), that a resident alien did not "enter" the United States when, after visiting Mexico for about two days, he accepted money from four aliens to

arrange for a third party to meet them in El Paso—*after* their illegal river crossing, in which Vargas-Banuelos apparently was not involved—to provide transportation away from the border area, and then recrossed, alone and after presenting himself for inspection at border checkpoints, into the United States. At some point after leaving the United States he formed an intent which was decidedly improper, but the appropriate language in *Fleuti* indicated that this was not sufficient—only his "*purpose of leaving the country,*" 374 U.S. at 462, 83 S.Ct. at 1812, 10 L.Ed.2d at 1008 (emphasis added), rather than his intentions formed *after* leaving, bore on the determination of whether his departure was "meaningfully interruptive" of his residence in this country:

> Under *Fleuti* and its progeny in this circuit, the failure of the Government to show a criminal purpose *prior to petitioner's departure* is fatal to its case.

466 F.2d at 1374 (emphasis added).[5]

Both *Yanez-Jacquez* and *Vargas-Banuelos* bear on some facets of the case before us. *Yanez-Jacquez* established, we believe, that Laredo-Miranda's act of wading the Rio Grande, standing alone, would not render his departure "meaningfully interruptive" of his residence and thus constitute an "entry."[6] *Vargas-Banuelos* establishes that an intent to aid illegal aliens, formed after the resident alien had departed from this country for a short visit, does not make his departure "meaningfully interruptive," at least when his return is through a proper checkpoint rather than by clandestine crossing of the border. In the instant case,

however, we face the confluence of one aspect of *Vargas-Banuelos* (aiding illegal aliens) with another aspect of *Yanez-Jacquez* (surreptitious crossing), under circumstances more compelling than in either of those cases. Yanez-Jacquez's intentions in crossing into Mexico armed with an ice pick, although scarcely commendable, did little or nothing to contravene either the letter or spirit of the immigration laws; and his recrossing by wading the river accomplished nothing more than avoiding the inconvenience of presenting himself at a checkpoint and waiting several hours for his identification to be fetched.[7] Vargas-Banuelos crossed into Mexico and recrossed legally; apparently neither the duration of his visit nor the manner of his return were affected by his extra-territorially acquired intention to commit a crime upon his return, and he committed no act in furtherance of the conspiracy into which he had entered while in Mexico until *after* his wholly lawful return to the United States.

Laredo-Miranda, on the other hand, was an active and most essential participant in bringing illegal aliens into this country at the precise time of his covert crossing by way of the river. Wading the river, avoiding the scrutiny of border inspection, was crucial to his role as pathfinder for the group. The Supreme Court in *Fleuti* left room for judicial development of "other possibly relevant factors" in evaluating whether a trip into a foreign country should be considered a meaningful interruption of an alien's status as a permanent resident alien. 374 U.S. at 462, 83 S.Ct. at 1812, 10 L.Ed.2d at 1009. We can conceive of little

---

**5.** Other courts of appeal have held that illicit intent will suffice to make a departure "meaningfully interruptive," regardless of whether such intent was formed before or after departure. *See Lozano-Giron v. INS,* 506 F.2d 1073, 1078 (7th Cir. 1974) (express holding); *Palatian v. INS,* 502 F.2d 1091, 1093–94 (9th Cir. 1974) (noting but declining to follow *Vargas-Banuelos*); *Bufalino v. INS,* 473 F.2d 728 (3d Cir. 1973), *application for stay of deportation denied,* 411 U.S. 901, 93 S.Ct. 1522, 36 L.Ed.2d 191 (1973) (implicit holding).

**6.** At oral argument the INS urged us to adopt a rule that any resident alien who crosses into

the United States without presenting himself at a border checkpoint makes an "entry" and subjects himself to deportation. Although we are sensitive to the problems faced by those who seek to enforce the immigration laws, and do not doubt the utility of such a rule to their work, *Yanez-Jacquez* binds us to a less rigorous interpretation of the Act. The INS's proposal could only be adopted by the *en banc* court, the Supreme Court or the Congress.

**7.** He apparently also wanted to remain on the American side of the Rio Grande and watch the other side to see if his assailants would appear. 440 F.2d at 702.

which would be more indicative of an alien's intent to disrupt his status as a *lawful* resident than a fully consummated intent, even if formed after departure from this country, to participate actively in bringing illegal aliens into the United States while himself coming in by the same illicit route. His very re-entry was in the course of committing a crime, just as though he had returned carrying contraband. He did far more, in other words, than merely wade the river; our focus is not on the *manner* of his crossing, but rather on his simultaneous ferrying of aliens as he crossed. Our holding would be no different had he driven across an international bridge and presented his identification to the authorities while carrying these aliens in the trunk of his automobile.

To sum up, then, we hold that although Laredo-Miranda's visit was of short duration, and his intentions upon leaving the country were innocent, he brought about a meaningful interruption in his permanent residence when he actively participated in bringing five aliens into the United States by serving as their pathfinder and guide, seeking to evade inspection and assisting them to do so by surreptitiously crossing the border at an unauthorized location. His crossing on August 16, 1975, thus must be considered an "entry" under § 101(a)(13) of the Act, and he has "entered" this country without inspection (and at an unauthorized place), so that he is subject to deportation under § 241(a)(2), 8 U.S.C. § 1251(a)(2) (1970). We believe that our holding is fully consistent with *Fleuti* and, indeed, that a contrary holding would be quite inconsistent, for we do not here subject Laredo-Miranda to the "sport of chance" or "meaningless and irrational hazards" in attempting to remain in this country, 374 U.S. at 460, 83 S.Ct. at 1811, 10 L.Ed.2d at 1008; the manner of his crossing was wholly voluntary and inextricably tied into his active facilitation of illegal entries into the United States. The order is

AFFIRMED.

WISDOM, Circuit Judge, dissenting:

I respectfully dissent. I would hold that this case is controlled by *Rosenberg v. Fleuti*, 1963, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000, and its progeny in this Circuit, *Vargas-Banuelos v. Immigration and Naturalization Service*, 5 Cir. 1972, 466 F.2d 1371 and *Yanez-Jacquez v. Immigration and Naturalization Service*, 5 Cir. 1971, 440 F.2d 701.

In *Yanez-Jacquez*, the petitioner, legally admitted into the United States in 1955, made a brief excursion into Mexico in 1963 to avenge an assault committed upon him while he was in Mexico the day before. He forgot to take with him his Border Crossing Identification Card. When he failed to find his intended victim, Yanez-Jacquez crossed the Rio Grande back into the United States. He was picked up by the border patrol, but was released when his mother came to the patrol station with his Border Crossing Identification Card. In 1968, Yanez-Jacquez was convicted of uttering a forged instrument and the United States, relying on the 1963 incident as an "entry", sought to deport him under 8 U.S.C. § 1251(a)(4). This section provides that an alien is deportable who "is convicted of a crime involving moral turpitude committed within five years after entry . . ." Despite the petitioner's criminal motive in leaving the United States, this Court held that the 1963 crossing did not constitute an "entry", because "there is less than adequate evidence in the record to support a finding that the petitioner left the country with the intent to interrupt in any meaningful manner his status as a permanent resident alien". 440 F.2d at 704.

In *Vargas-Banuelos*, the petitioner was admitted into the United States as a permanent resident alien in 1963. In 1970 he went to Mexico to pay a condolence call. While there, he was approached by four Mexicans who sought his aid in gaining illegal entry into the United States. The petitioner accepted money from them and helped them arrange their illegal entry. All of the parties, including Vargas-Banue-

los, were apprehended in Texas shortly after crossing the border. It is unclear whether Vargas-Banuelos himself actually entered the country in an illegal manner. He pleaded guilty to four counts of aiding and abetting the four Mexicans in entering the country illegally, and the United States—using his condolence excursion and return as an "entry"—attempted to deport him under 8 U.S.C. § 1251(a)(13). This section provides that an alien is deportable who "prior to, or at the time of entry, or at any time within five years after any entry, shall have, knowingly and for gain, encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United Stated in violation of law". Emphasizing that Vargas-Banuelos did not harbor any criminal intent before leaving the United States and that the purpose of his trip was to make a brief condolence call, we held that Vargas-Banuelos's 1970 border-crossing did not constitute an entry under *Fleuti* and *Yanez-Jacquez,* and issued these words of caution: "Let us not exalt every migrant's deviation from rectitude into illegal 'entries' within the statutory definition". 466 F.2d at 1374.

Thus, the state of the law in this circuit regarding what constitutes an "entry" within the definition of that term given in § 101(a)(13) of the Immigration and Nationality Act, 8 U.S.C. § 101(a)(13), for purposes of deporting a resident alien for any of the reasons listed in § 241 of the Act, 8 U.S.C. § 1251, is as follows: Where a resident alien's excursion out of the United States is brief, the government must show (1) that the alien had a subjective intention at the time of his departure from the United States to interrupt his residential status, or (2) that the resident alien harbored a criminal purpose before leaving the United States, to make the alien's re-entry into the United States an "entry". Neither of these criteria are met in the instant case. First, the government does not contend, and nothing in the facts indicates, that Laredo-Miranda intended to interrupt his status as a resident alien. Indeed, the majority recognizes that "Laredo-Miranda entered Juarez,

Mexico, on August 16, 1975, for the sole purpose of having a meal with his girl friend and her family . . . ." at 1243. Second, as the majority and the Immigration and Naturalization Service also concede, when Laredo-Miranda left the United States, he "did not intend to take part in the actual smuggling". *Id.*

Furthermore, rather than supporting the Board's order, the one factor that distinguishes *Fleuti, Yanez-Jacquez,* and *Vargas-Banuelos* from the instant appeal makes the case for reversal of Laredo-Miranda's deportation order even more compelling. In those cases, the "entry" involved was simply a necessary prerequisite for deporting the resident aliens for *other* reasons—Fleuti's homosexuality, Yanez-Jacquez's conviction of uttering a forged instrument, and Vargas-Banuelos's conviction of aiding and abetting illegal entry. In this case, on the other hand, the resident alien's alleged illegal entry alone is the very reason he is being deported. The petitioners in *Yanez-Jacquez* and *Vargas-Banuelos,* who were *convicted* of criminal acts, were certainly more culpable and less desirable residents than Laredo-Miranda, whose alleged wrongdoing in aiding illegal aliens to enter the country has never even been the subject of a criminal prosecution. This is especially so in light of the fact that, in addition to their subsequent criminal acts, Yanez-Jacquez's 1963 entrance was definitely, and Vargas-Banuelos's 1970 entry was apparently as illegal as Laredo-Miranda's entry was here. I would REVERSE the Board's order.