United States Court of Appeals,

Fifth Circuit.

No. 94-40411.

Carlos Alberto CARBAJAL-GONZALEZ, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

March 27, 1996.

Petition for Review of Order of Immigration and Naturalization
Service.

Before JOLLY, DUHÉ and WIENER, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

We reverse the INS order of deportation in this case.

An immigration judge ordered Carlos Alberto Carbajal-Gonzalez
deported to Mexico for violations of the Immigration and
Nationality Act (the "Act").  The Board of Immigration Appeals
affirmed the deportation order.  Concluding that, as a matter of
law, Carbajal-Gonzalez did not "enter" the United States within the
meaning of the Act, we reverse.[1]

I

Carbajal-Gonzalez was granted lawful permanent resident status
in the United States on November 27, 1991.  He is a twenty-five
year old native and citizen of Mexico.  He lives in El Paso, Texas.
His wife is a United States citizen.  He teaches folk dancing in
Ciudad Juarez, Mexico, and has crossed the U.S.-Mexican border many

---

[1]Because we reverse the deportation order on the ground that
there was no "entry" under the Act, we do not address Carbajal-
Gonzalez's remaining arguments.

1

times by presenting his valid immigration document.

On October 29, 1992, Carbajal-Gonzalez and his wife went to a party in a bar after a dance recital in Juarez. Jorge Rodriguez-Alvidrez was a student in Carbajal-Gonzalez's dance class. He was also at the party. Carbajal-Gonzalez decided that he wanted to buy more beer. Because of the late hour, he believed that he could only do so in the United States. Rodriguez-Alvidrez offered to help Carbajal-Gonzalez in purchasing the beer. At first, Carbajal-Gonzalez declined the offer, but he then acquiesced. Rodriguez-Alvidrez was not a United States citizen, and that night he carried no documentation on his person that would allow him to enter the United States legally. It is unclear whether Rodriguez-Alvidrez did, in fact, possess such documents. Carbajal-Gonzalez's wife drove the two men to the Bridge of the Americas Port of Entry, and she kept her husband's immigration document. The two men, both inebriated, got out of the car and walked across the bridge on the side opposite to the inspection facilities. Neither man passed through inspection. Carbajal-Gonzalez's wife drove across the bridge and picked up her husband and Rodriguez-Alvidrez on the U.S. side. Shortly thereafter, the border patrol arrested the two men.

An Order to Show Cause issued, which charged Carbajal-Gonzalez with entry without inspection under 8 U.S.C. § 1251(a)(1)(B) and smuggling aliens under 8 U.S.C. § 1251(a)(1)(E)(i).[2] After finding

---

[2]Specifically, the pertinent portions of the statute provide:

§ 1251. Deportable aliens

(a) Classes of deportable aliens

2

that the charges in the Order to Show Cause were supported by clear, unequivocal and convincing evidence, the immigration judge (the "IJ") ordered that Carbajal-Gonzalez be deported. The Board of Immigration Appeals (the "Board") affirmed the order and dismissed Carbajal-Gonzalez's appeal. Carbajal-Gonzalez now petitions this court for review.

## II

On appeal, Carbajal-Gonzalez argues that the evidence of an entry without inspection and of smuggling is insufficient to meet

---

> Any alien (including an alien crewman) in the United States shall, upon the order of the Attorney General, be deported if the alien is within one or more of the following classes of deportable aliens:
>
> (1) Excludable at time of entry or of adjustment of status or violates status
>
> ...
>
> (B) Entered without inspection
>
> Any alien who entered the United States without inspection or at any time or place other than as designated by the Attorney general or is in the United States in violation of this chapter or any other law of the United States is deportable.
>
> ...
>
> (E) Smuggling
>
> (i) In general
>
> Any alien who (prior to the date of entry, at the time of any entry, or within 5 years of the date of any entry) knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is deportable.

8 U.S.C.A. § 1251(a)(1)(B), (E)(i) (West Supp.1995)

3

the required burden of clear, unequivocal and convincing evidence. On the other hand, the Immigration and Naturalization Service (the "INS") argues that substantial evidence supports the order of deportation. More specifically, the INS urges that Carbajal-Gonzalez's own admissions prove that he aided and abetted an alien's illegal entry into the United States; therefore, within the meaning of the Act, Carbajal-Gonzalez's return to the United States was an "entry" without inspection, and his assistance of Rodriguez-Alvidrez constituted a smuggling. The INS further argues that this court's review of the Board's decision is limited by the substantial evidence standard. Therefore, we may reverse the deportation order only if the evidence compels the conclusion that the Board's decision was wrong.

We shall first discuss the applicable standard of review, then briefly review the body of relevant United States Supreme Court and Fifth Circuit case law, and finally turn to the merits of this appeal.

III

A

Generally, in immigration cases, we review only the decision of the Board, not that of the IJ. *Ogbemudia v. I.N.S.,* 988 F.2d 595, 598 (5th Cir.1993) (footnote omitted). The Board conducts a *de novo* review of the administrative record, and we consider the errors of the IJ only to the extent that they affect the Board's decision. *Id.* We sustain an order of deportation if it is supported by "reasonable, substantial, and probative evidence on

4

the record considered as a whole." 8 U.S.C. § 1105a(a)(4); *see also Woodby v. I.N.S.,* 385 U.S. 276, 281-82, 87 S.Ct. 483, 486, 17 L.Ed.2d 362 (1966). The substantial evidence standard "requires only that the Board's conclusion be based upon the evidence presented and that it be substantially reasonable." *Wilson v. I.N.S.,* 43 F.3d 211, 213 (5th Cir.1995) *quoting Animashaun v. I.N.S.,* 990 F.2d 234, 237 (5th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 557, 126 L.Ed.2d 458 (1993). We review factual conclusions of the Board for substantial evidence. *Ozdemir v. I.N.S.,* 46 F.3d 6, 7 (5th Cir.1994), *citing Silwany-Rodriguez v. I.N.S.,* 975 F.2d 1157, 1160 (5th Cir.1992). We will affirm the Board's decision unless the evidence compels a contrary conclusion. *Ozdemir,* 46 F.3d at 8. In other words, the alien must show that the evidence was so compelling that no reasonable factfinder could conclude against it. *Chun v. I.N.S.,* 40 F.3d 76, 78 (5th Cir.1994) *citing I.N.S. v. Elias-Zacarias,* 502 U.S. 478, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992); *Silwany-Rodriguez,* 975 F.2d at 1160. This court reviews conclusions of law *de novo* (although with the usual deference to the Board's interpretations of ambiguous provisions of the Act in accordance with *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

As noted, we may review actions of the IJ only when they have some impact on the Board's decision. *Chun v. I.N.S.,* 40 F.3d 76, 78 (5th Cir.1994) *citing Adebisi v. I.N.S.,* 952 F.2d 910, 912 (5th Cir.1992). In the instant case, the IJ failed to apply properly

5

the Supreme Court doctrine set forth in *Rosenberg v. Fleuti,* 374 U.S. 449, 462, 83 S.Ct. 1804, 1812, 10 L.Ed.2d 1000 (1963), as that doctrine has been developed by this circuit's precedent discussed below. This failure resulted in an evidentiary proceeding and legal decision that focused upon isolated events occurring after Carbajal-Gonzalez left the United States to the exclusion of all other relevant factors. *See Rivas-Martinez v. I.N.S.,* 997 F.2d 1143, 1146 (5th Cir.1993). Rather than correct this error, the Board adopted the IJ's misapplication of the doctrine and failed to perform the proper weighing of critical factors and circumstances that our precedent requires. Because the substantial evidence standard of review implicitly presumes that the Board performed the proper legal analysis, that standard cannot apply to our review of this appeal. *Id.* Instead, we review *de novo* the Board's interpretation and application of our precedent. *Id.*

B

The government brought two charges against Carbajal-Gonzalez: illegal entry without inspection and alien smuggling. 8 U.S.C. § 1251(a)(1)(B), (E)(i). A prerequisite to both charges is that Carbajal-Gonzalez must have made an "entry" into the United States as defined in 8 U.S.C. § 1101(a)(13). Contrary to the ordinary use of the word "entry," the requirement of an "entry" under the Act is a term of art in judicial parlance, which must be understood in the context of the resident alien's subjective intent at the time of departure from the United States. *Fleuti,* 374 U.S. at 461-63, 83 S.Ct. at 1812; *see also, e.g., Vargas-Banuelos v. I.N.S.,* 466 F.2d

6

1371, 1372-74 (5th Cir.1972). We look to the alien's intent because, for purposes of the Act, a lawful permanent resident alien does not make an "entry" (actually re-entry) into the United States if "the alien proves to the satisfaction of the Attorney General that his departure ... was not intended...." 8 U.S.C. § 1101(a)(13). Because a review of the "judicial gloss" that now surrounds this term of art will facilitate a better understanding of our holding in this case, we begin by revisiting the standard announced by the Supreme Court in *Fleuti* and by examining the Fifth Circuit progeny that has followed.

C

Under what has come to be known as "the *Fleuti* doctrine," the United States Supreme Court held that a resident alien does not effect an "entry" for the purposes of 8 U.S.C. § 1101(a)(13) when he returns from an "innocent, casual, and brief excursion" outside the United States; instead, such an alien effects an entry only if he intended to depart in a manner "meaningfully interruptive" of the alien's permanent residence. *Fleuti,* 374 U.S. at 462, 83 S.Ct. at 1812, *explained in Molina v. Sewell,* 983 F.2d 676, 679 (5th Cir.1993). Rejecting as contrary to congressional intent a "woodenly construed" entry doctrine, the Supreme Court set forth three factors to be considered in determining whether an alien had the requisite intent to effect a meaningful interruption of permanent residence status: (1) the length of the alien's absence from the United States; (2) whether the alien had to procure travel documents for the trip; and (3) the purpose of the visit,

7

with an emphasis on whether the purpose was contrary to immigration policy. *Fleuti,* 374 U.S. at 461-62, 83 S.Ct. at 1811-12. The Court indicated, however, that its list of factors was not exhaustive and remained to be developed by judicial inclusion and exclusion. *Id.* at 462, 83 S.Ct. at 1812.

This circuit first applied the *Fleuti* doctrine in *Yanez-Jacquez v. I.N.S.,* 440 F.2d 701 (5th Cir.1971). In that case, a resident alien, who was armed with an ice pick, made a short trip into Juarez for the stated purpose of avenging an assault and robbery that had been committed against him. We concluded, under *Fleuti,* that Yanez-Jacquez had not "entered" the United States when he discovered a few hours after his departure that he had forgotten his alien registration card and waded back across the river to retrieve it. In reaching this result, the court weighed the *Fleuti* factors (i.e., his "less than salutory purpose" in departing versus the brief duration of his trip, the numerous short round-trip visits that he habitually made between Mexico and the United States and his possession of a Border Crossing Identity Card, which he failed to carry on the occasion in question). On balance, we concluded that the latter factors outweighed Yanez-Jacquez's illicit purpose upon departure and that he did not intend to "interrupt in any meaningful manner his status as a permanent resident alien." *Id.*

A more straight-forward set of facts arose in *Solis-Davila v. I.N.S.,* 456 F.2d 424 (5th Cir.1972), a case that we decided on summary calendar. The petitioner, Solis-Davila, left the United

8

States with the express intent of smuggling Mexican aliens into this country. He executed the crime and then reentered the United States, where he received payment for his work. Solis-Davila pled guilty to alien smuggling and was sentenced. His guilty plea was corroborated by the overwhelming sworn testimony of third-parties. Looking to *Fleuti,* we easily distinguished Solis-Davila's criminal intent and conduct, which permeated his trip southward, from the short, innocent trip abroad that was made by the petitioner in *Fleuti. Id.* at 426-27. A unanimous panel affirmed the deportation order.

We examined the "entry" doctrine with closer scrutiny in *Vargas-Banuelos v. I.N.S.,* 466 F.2d 1371 (5th Cir.1972). In *Vargas-Banuelos,* a resident alien traveled to Juarez, Mexico, to pay a condolence call on a family member. While in Juarez, four Mexicans asked Vargas-Banuelos to help them enter illegally into the United States and then travel to Chicago. Vargas-Banuelos agreed to help them, accepted payment, and arranged for someone to meet and assist the four illegal aliens in El Paso, Texas. Vargas-Banuelos was arrested in Texas and convicted in a federal district court of aiding and abetting alien smuggling. The Board later ordered Vargas-Banuelos deported, and this court reversed. In our review of the Board's decision, we first examined *Fleuti* and its application in *Yanez-Jacquez* and *Solis-Davila.* Weighing factors such as Vargas-Banuelos's brief trip, his lawful return into the United States and his innocent state of mind at the time of his departure against the criminal activity in which he eventually

9

engaged, we reasoned that "[u]nder *Fleuti* and its progeny in this circuit, the failure of the Government to show a criminal purpose prior to petitioner's departure is fatal to its case." *Vargas-Banuelos,* 466 F.2d at 1373-1374.

A few years later, in *Laredo-Miranda v. I.N.S.,* 555 F.2d 1242 (5th Cir.1977), we once again examined the *Fleuti* doctrine and its evolution in Fifth Circuit precedent. We observed that, standing alone, neither (1) the act of returning to the United States by wading across a river rather than by way of an authorized checkpoint; nor (2) a post-departure formation of intent to aid illegal aliens followed by a return through a proper checkpoint, renders a resident alien's departure "meaningfully interruptive" of his residence so as to constitute an "entry." *Laredo-Miranda,* 555 F.2d at 1245-46, *discussing Yanez-Jacquez v. I.N.S.,* 440 F.2d at 701 and *Vargas-Banuelos,* 466 F.2d at 1371. The particular facts of *Laredo-Miranda* fell between these two developing principles.

In *Laredo-Miranda,* a lawful resident alien crossed the border into Juarez, Mexico, to have a meal with his girlfriend and her family. He traveled with a companion who intended to smuggle a group of illegal aliens into the United States. Laredo-Miranda, however, had no such criminal intention upon leaving the United States. When returning, Laredo-Miranda discovered that he had forgotten his alien registration card. Rather than explain his mistake to the border officials, Laredo-Miranda decided to wade across the river with the group of illegal aliens. He first waded solo into the river—presumably to "test the waters" for the

10

presence of the border patrol.  When no authorities appeared, he returned to the Mexican riverbank and, leading the group of five aliens, waded across a second time.  Laredo-Miranda proceeded to guide the group of illegal aliens across the border at an unauthorized location.

Under *Fleuti,* we weighed Laredo-Miranda's short visit to Mexico and his innocent intentions upon leaving the United States against his wholly voluntary and active ferrying of a group of illegal aliens into the United States.  We concluded that a meaningful interruption in his permanent residence status had occurred.  In reaching this conclusion, we factually distinguished the case from *Vargas-Banuelos:*

> Vargas-Banuelos crossed into Mexico and recrossed legally; apparently neither the duration of his visit nor the manner of his return were affected by his extra-territorially acquired intention to commit a crime upon his return, and he committed no act in furtherance of the conspiracy into which he had entered while in Mexico until *after* his wholly lawful return to the United States.
>
> Laredo-Miranda, on the other hand, was an active and most essential participant in bringing illegal aliens into this country at the precise time of his covert crossing by way of the river....  We can conceive of little which would be more indicative of an alien's intent to disrupt his status as a *lawful* resident than a fully consummated intent, even if formed after departure from this country, to participate actively in bringing illegal aliens into the United States while himself coming in by the same illicit route.

*Laredo-Miranda,* 555 F.2d at 1245-46.

Although we upheld the order of deportation in *Laredo-Miranda,* we declined to adopt the bright-line rule proposed by the INS at oral argument:  namely, that any resident alien who crosses into the United States without presenting himself at a border checkpoint

11

makes an "entry" under the Act. We observed that the holding of *Yanez-Jacquez* bound us to a less rigorous interpretation of the Act. *Id.* at 1245 n. 6.

What is clear from the precedent in this circuit, including our analysis in *Laredo-Miranda,* is that a careful balancing of the *Fleuti* factors (as modified by our precedent and any peculiar facts of the case at hand) **must** be performed in deciding whether an "entry" under the Act has occurred. The holding of *Laredo-Miranda* cannot be construed to liberate us from this analysis. To the contrary, our decision in *Laredo-Miranda* actually expands upon this balancing process by suggesting a new factor for our consideration: a resident alien's *fully consummated* intent to participate actively in alien smuggling, whether formed prior to or after departure from the United States. Accordingly, in line with *Fleuti* and its Fifth Circuit progeny, we turn to balance the factors critical to this case so that we might determine whether Carbajal-Gonzalez intended to bring about a meaningful interruption in his permanent resident status.

## IV

The evidence in the record before us consists primarily of Carbajal-Gonzalez's sworn statement to a border patrol agent at the time of his arrest and the deportation hearing testimony of Carbajal-Gonzalez, his wife, and mother-in-law. At the hearing, Carbajal-Gonzalez appeared *pro se* and required an interpreter to translate from English to Spanish during the proceeding. The evidence pertinent to our analysis under *Fleuti* reveals that

12

Carbajal-Gonzalez maintained his home in El Paso, Texas, with his wife, a United States citizen.  Carbajal-Gonzalez taught classes at a dance school in Juarez, Mexico, and entered many times into the United States by showing his immigration card.  According to his deportation hearing testimony, he was, on the night in question, with his wife at a party and a dance in Juarez.  The government does not challenge that the purpose of his visit to Mexico was purely social.  Carbajal-Gonzalez left the party in Juarez with his wife and one of his dance students, Rodriguez-Alvidrez, to buy more beer in the United States.  The testimony indicates that both Carbajal-Gonzalez and his wife believed Rodriguez-Alvidrez to be a documented alien, although without documents on his person at the time.  The government neither rebutted this testimony nor offered any evidence regarding Rodriguez-Alvidrez's status for immigration purposes.  The hearing testimony indicates that the two men were inebriated and intended to cross the border into the United States, buy beer and return to the party in Juarez.[3]  Carbajal-Gonzalez's wife drove them to the bridge at the border.  She argued with her husband and kept his "papers."  The two men got out of the car and walked across the bridge without going through inspection.

In sharp contrast to the evidence of a fully consummated intent to commit a crime and the ensuing criminal conduct in *Laredo-Miranda* and *Solis-Davila,* the case here presents a set of

---

[3]Carbajal-Gonzalez's arrest statement indicates that they planned to ride around after buying the beer.  At his deportation hearing, he corrected this statement as an inaccuracy in the sworn statement and stressed that they intended to buy the beer and return to the party in Juarez.

13

facts that could hardly be less prosecution-worthy. The IJ's error in his legal analysis, under a misguided interpretation of *Laredo-Miranda,* was his disregard of the full panoply of *Fleuti* factors. Ignoring any positive factors presented by Carbajal-Gonzalez in his *pro se* defense, the IJ focused solely on concluding that Carbajal-Gonzalez was guilty of alien smuggling. *See Rodriguez-Gutierrez v. INS,* 59 F.3d 504, 508-09 (5th Cir.1995) (Board abused its discretion by failing to give meaningful weight to the positive equities in the case and by improperly characterizing the negative equities). Compounding this error, the Board also failed to perform the careful balancing of the *Fleuti* factors that our precedent requires. Instead, the Board rigidly relied upon two "admissions" that Carbajal-Gonzalez gave in response to the IJ's questioning at the deportation hearing:

> Q: And did you assist [Rodriguez-Alvidrez] in entering the United States?[4]
>
> A: Yes.
>
> .    .    .    .    .
>
> Q: ... I'm also satisfied that the reason you entered was to be with this .. [sic] to be with Jorge. You have a card. That card would entitle you to enter the United States any time you wanted to. So the only reason you entered without inspection was so .. [sic] to be with Jorge, to help him in, correct?

---

[4]As previously noted, Carbajal-Gonzalez testified at the deportation hearing with the help of an English/Spanish interpreter. Because we are struck by the number of legal terms of art that appear in this transcript and are sensitive to the difficulty of fully comprehending such terms in translation without the assistance of counsel, we must observe that a verb such as "assist" when translated into the Spanish may be understood to mean nothing more than "to accompany." CASSELL'S SPANISH DICTIONARY (Funk & Wagnalls 1968).

14

A: Yes.

Record at 4-5, 38, 43.

What the IJ, the Board, and the INS have overlooked are, among other things: Carbajal-Gonzalez's length of absence from the United States, the purpose of his junket to Juarez, his stated intent to buy beer in the United States and return with Rodriguez-Alvidrez to Juarez, his belief (corroborated by his wife) that Rodriguez-Alvidrez was a documented alien, the absence of any evidence that Carbajal-Gonzalez formed a fully consummated criminal intent to secrete illegal aliens into the United States, and highly probative portions of Carbajal-Gonzalez's testimony at the deportation hearing such as:

> Q: Is it true that about October the 30th, 1992, you knowingly encouraged, induced, assisted, aided, and abetted Jorge Rodriguez-Avidres (phonetic sp.), an alien, to enter the United States in violation of law?

> A: I didn't induce. We were .. [sic] I just met him and we were talking and we crossed together.

Record at 37.

Having considered the record in its entirety and having had the benefit of hearing and questioning counsel at oral argument, we are left with the firm conviction that the resident alien's conduct in this case is poles apart from that manifested in *Laredo-Miranda.* The conduct in *Laredo-Miranda* was susceptible to only one interpretation: Laredo-Miranda fully intended to smuggle undocumented aliens into this country, aliens who intended to remain and reside in the United States illegally. Laredo-Miranda then executed upon his criminal intent in an active leadership

15

role.  Here, on this record, Carbajal-Gonzalez's senseless conduct can be viewed as hardly more than a foolish lark, walking a drunk friend across the wrong side of the Bridge of the Americas without inspection.  Although we certainly do not condone Carbajal-Gonzalez's failure to carry the proper papers and his attempt to evade inspection at the border, it is impossible for us to conclude that this drunken imprudence gave rise to a meaningful interruption of his permanent residence in this country.  We hold, therefore, that Carbajal-Gonzalez did not "enter" the United States on October 29, 1993, within the meaning of 8 U.S.C. § 1101(a)(13).  It follows that, because there was no "entry" under the Act (an essential element to both charges levied against Carbajal-Gonzalez), there was neither an 8 U.S.C. § 1251(a)(1)(B) entry without inspection nor a smuggling pursuant to 8 U.S.C. § 1251(a)(1)(E)(i).[5]

---

[5]Although our reversal of the deportation order against Carbajal-Gonzalez on the ground that there was no "entry" is dispositive of this appeal, we also observe that the INS has pursued simultaneously a charge of alien smuggling against Carbajal-Gonzalez.  An alien is excludable pursuant to Section 1251(a)(1) and therefore deportable who "... prior to the date of entry, at the time of any entry, or within 5 years of the date of any entry ... knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law."  8 U.S.C. § 1251(a)(1)(E)(i).  On the facts before us, there is insubstantial evidence that Carbajal-Gonzalez *knowingly* smuggled an alien into the United States.  In other words, the necessary scienter element is missing in this case.

On this record, what we see is one drunk helping another drunk walk across the wrong side of the bridge at the border in a late night search for more beer.  Even the IJ conceded in his decision that Carbajal-Gonzalez's motivation in "helping Jorge enter the United States in violation of law is not clear."  Because there is a lack of evidence that Carbajal-Gonzalez intended anything more than a round trip to the supermarket to buy beer, we cannot accept on this record that

16

CONCLUSION

Under the *Fleuti* analysis and its Fifth Circuit progeny, the evidence does not show that Carbajal-Gonzalez entered the United States as required by 8 U.S.C. § 1251(a)(1). Therefore, as a matter of law, neither of the Section 1251(a)(1) charges against Carbajal-Gonzalez in the Order to Show Cause is supported by the record. Accordingly, we VACATE the deportation order and REVERSE the Board's decision.

VACATED and REVERSED.

---

Carbajal-Gonzalez was of the state of mind to formulate a knowing plan to smuggle aliens, particularly in the light of the fact that he believed his friend to be a documented (not an illegal) alien.

17