Martin ROSENDO–RAMIREZ,
Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 93–2921.

United States Court of Appeals,
Seventh Circuit.

Argued April 20, 1994.

Decided Aug. 10, 1994.

James Hallagan (argued), Minsky, McCormick & Hallagan, Chicago, IL, for petitioner.

Michael J. Shepard, Asst. U.S. Atty., Crim. Div., Chicago, IL, David V. Bernal (argued), Dept. of Justice, Office of Immigration Litigation, Janet Reno, U.S. Atty. Gen., Washington, DC, Samuel Der–Yeghiayan, Chicago, IL, William J. Howard, David J. Kline, Dept. of Justice, Office of Immigration Litigation, Washington, DC, for respondent.

Before BAUER and CUDAHY, Circuit Judges, and GRANT, District Judge.*

CUDAHY, Circuit Judge.

Chicago resident Martin Rosendo–Ramirez, a legal permanent resident of the United States since 1983, was apprehended on April 12, 1989 at the airport in El Paso, Texas, about ten miles inside the United States border. Rosendo and his wife and sister-in-law, both undocumented aliens, had just boarded a private plane scheduled to fly to New Mexico. Acting on an anonymous tip that the plane would be ferrying undocumented aliens, Border Patrol Agent Benjamin Robinson halted the plane and detained the passengers and pilot (a U.S. citizen) for questioning. Robinson concluded that the passengers were undocumented aliens, and arrested all three and took them to the Border Patrol office for further questioning. Computer files then revealed that Rosendo was a permanent resident. Based upon Agent Robinson's conclusion that Rosendo had departed from the United States and re-entered with his wife and sister-in-law, deportation proceedings were commenced against Rosendo for entering the United States without inspection, in violation of INA § 241(a)(2), 8 U.S.C. § 1251(a)(2) (1988).[1] Rosendo's wife and sister-in-law were processed for voluntary departure and left for Mexico that same evening.

Agent Robinson testified at Rosendo's deportation hearing. Robinson testified that he had questioned all three individuals for two-and-a-half to three hours, interrogating Rosendo both separately and along with the two women. Their statements indicated to him that they had all come from a ranch in Mexico and were heading to Rosendo's parents' house in Chicago. Robinson testified that he had asked all three how they entered the country, and that Rosendo had said he entered the United States across the Bridge of Americas "on the west sidewalk." Robinson testified (in an interesting insight into border security) that there were no immigration inspectors on the west side of the bridge, so a person walking from Mexico to the United States along the west sidewalk would not be subjected to immigration inspection. Robinson could not remember, but believed that all three told the same story about how they entered the United States. Robinson also testified that Rosendo had said that he had departed from the United States about

---

* The Honorable Robert A. Grant, District Judge for the Northern District of Indiana, is sitting by designation.

1. The Immigration Act of 1990, Pub.L. 101–649, 104 Stat. 4978 (1990) renumbered the code sections listing grounds for deportation. Entry without inspection, formerly codified at 8 U.S.C.

§ 1251(a)(2) is now listed at § 1251(a)(1)(B). Since Rosendo's deportation proceedings commenced prior to the amendments, we refer to the pre–1990 version of the Code. All aliens—including permanent residents—must be inspected upon entry. 8 U.S.C. § 1251(a)(2).

five months before his re-entry to live with his wife in Mexico.

The other piece of evidence admitted at the deportation hearing was the INS Form I–213 (Record of Deportable Alien). The I–213, prepared by Agent Robinson after the initial encounter with Rosendo, purports to record Rosendo's statements during the interrogation. After listing basic identifying information, the I–213 provides in its entirety:

> Subject was encountered this date at the Cutter Beechcraft, private air terminal in El Paso, Texas. Subject was encountered as a result of a confidential informant telephonic received at Border Patrol in El Paso, Texas. The information received indicated that a pilot had arrived at El Paso and was awaiting people to transport to Hobbs, New Mexico. Above mentioned agents proceeded to the location and met with the informant. The informant pointed out the pilot and several minutes later, subject arrived with two other (illegal) aliens from Mexico. All four (including pilot) boarded the small craft and were about to depart when they were instructed to re-taxi. At that time, the plane was approached and asked to state his citizenship. He stated that he was an American citizen. The passengers were also asked and subject along with them stated that they were in fact Mexican nationals, illegally in the United States. At that time, all were then placed under arrest. Upon interrogation, the following was ascertained: subject departed Chicago, Ill. on/about Nov. 15, 1988. (He had been staying with his parents for about 7 mos. prior) At the time of his departure, he intended to travel to El Cocon, Mncpo., Purisima, Gto., Mexico, where he was to stay with his lawful spouse. Subject stated that his intentions also were to ultimately take his spouse to Chicago, Ill. (All the aforementioned information was obtained *after* subject was confronted with the fact that CO indicated that he was indeed a LAPR, all along subject maintained that he was totally undocumented.) Subject also stated

that he entered the United States illegally on above stated date and time walking north on the south-bound sidewalk at BOA POE. Subject further stated that he has no residence in the United States at this time, he simply stays at his parents' resident in Chicago, Ill. whenever he does travel there. He also stated that his Alien Registration Receipt Card is, at this time, in Mexico. He stated he had left it there in order to easily claim not documented and therefore be granted a VR.

The Immigration Judge terminated the deportation hearing, holding that a permanent resident is not deportable for entry without inspection unless he is guiding unlawful aliens into the country and that the INS had not proven that Rosendo was acting as a pathfinder. The Board of Immigration Appeals reversed, finding that the IJ had incorrectly stated the applicable law. The BIA granted Rosendo voluntary departure.

■■■ Rosendo petitions for review of the decision of the BIA, raising three claims: that the Immigration Judge erred in admitting the I–213 into evidence; that there was insufficient evidence that he had entered the country without inspection; and that since he had not made an "entry" for the purposes of the immigration laws, 8 U.S.C. § 1101(a)(13), he was not deportable. We review the decision of the BIA to determine whether its factual findings are supported by "reasonable, substantial and probative evidence." 8 U.S.C. § 1105a(a)(4); *Woodby v. INS*, 385 U.S. 276, 286–87, 87 S.Ct. 483, 488–89, 17 L.Ed.2d 362 (1966). In order to reverse, we must find that the evidence compels the conclusion that the BIA was wrong. *INS v. Elias–Zacarias*, —— U.S. ——, ——, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992). We review conclusions of law *de novo*, although we defer to the BIA's reasonable interpretations of ambiguous provisions of the Act. *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Zalega v. INS*, 916 F.2d 1257, 1259 (7th Cir.1990); *Jaramillo v. INS*, 1 F.3d 1149, 1153 (11th Cir.1993).[2]

2. *Chevron* requires deference to the reasonable interpretations of the agency "entrusted to administer" the statute. 467 U.S. at 844, 104 S.Ct. at 2782. The Attorney General has the full au-

## I. Admissibility of I–213

■ Rosendo argues that the Board of Immigration Appeals erred in admitting the I–213 into evidence as substantive proof of deportability.[3] Although the hearsay rule does not apply to administrative proceedings, *Cunanan v. INS,* 856 F.2d 1373, 1374 (9th Cir.1988), the Fifth Amendment's guarantee of a full and fair hearing limits admissibility of evidence. *Id.; Bridges v. Wixon,* 326 U.S. 135, 153–56, 65 S.Ct. 1443, 1452–53, 89 L.Ed. 2103 (1945). Evidence is admissible in a deportation hearing if it is probative on the issue of entry into the United States and its use is fundamentally fair. *Tejeda–Mata v. INS,* 626 F.2d 721, 724 (9th Cir.1980), *cert. denied,* 456 U.S. 994, 102 S.Ct. 2280, 73 L.Ed.2d 1291 (1982); *Bustos–Torres v. INS,* 898 F.2d 1053, 1055 (5th Cir.1990). Rosendo claims that the I–213 was neither probative nor fundamentally fair. Rosendo's arguments about fundamental fairness are at bottom claims that the I–213 was too unreliable, so we essentially consider only the question of whether it was probative.

■ Since the I–213 is supposed to be a record of a conversation with an alien, courts have evaluated its probative value by considering whether there is evidence that the form is inaccurate or that the information recorded in it was obtained by someone other than the alien himself. *Bustos–Torres,* 898 F.2d at 1056; *Tejeda–Mata,* 626 F.2d at 724. Rosendo contends that Agent Robinson's testimony about the interrogations leading to preparation of the I–213 report show that the I–213 contains information provided by persons other than Rosendo. Agent Robinson testified that he did not interview the four witnesses separately (the passengers and the

pilot), but rather jumped from one witness to another and engaged in a "discussion amongst all the witnesses." A.R. 73. He could not recall the order in which he spoke to individuals, or whether all of them told the same story about entering the United States. Rosendo argues that these factors prove that the one-paragraph I–213 was in fact a compilation of testimony from the four witnesses and the informant, and therefore was unreliable.

But the testimony that Agent Robinson conducted several interviews at once does not "compel the conclusion" that the BIA erred when it found the I–213 credible. *Elias–Zacarias,* —— U.S. at —— n. 1, 112 S.Ct. at 815 n. 1. Robinson's testimony that he could not remember aspects of the interrogation—such as the order in which he interviewed witnesses or which witnesses provided information—at most casts doubt on, but does not contradict, the statements made in the I–213. Rosendo can adduce no additional evidence that the statements on the I–213 were made by anyone other than himself. He points out that the I–213 contains a legal conclusion—"subject stated that he entered the United States illegally"—other than merely his description of entry. But this alone does not impeach the I–213: Rosendo could have made the statement, and can point to no evidence that he did not.

Rosendo also claims that the I–213 is not probative of his entry to the United States because it was impeached by Agent Robinson's testimony on other points. According to the I–213, Rosendo "stated he entered the United States illegally on above stated date and time walking north on the southbound sidewalk at BOA POE," meaning the Bridge

---

3. The INS argues that Rosendo has waived this claim by failing to object at the hearing and failing to raise this argument before the BIA. Rosendo claims that although he agreed to admission of the I–213 to refresh Agent Robinson's recollection, he objected to its admission for substance. The record is somewhat ambiguous on this point, A.R. 57, showing that Rosendo objected but may have withdrawn the objection. But the BIA obviously found that Rosendo had preserved the objection and had not waived it on appeal, for the BIA addressed the I–213 on the merits. Since the BIA did not consider the claim waived, neither do we.

thority to administer the INA. INA § 103, 8 U.S.C. § 1103. She in turn has delegated authority to both the Commissioner of the INS and the Board of Immigration Appeals. 8 C.F.R. Part 3; *see generally* 1 Gordon & Mailman, *Immigration Law and Procedure,* § 3.05. Accordingly, we defer to the BIA's interpretations. *See generally INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (deference owed to BIA interpretations of statute); *compare Jones v. Director, OWCP,* 977 F.2d 1106, 1110 (7th Cir.1992) (deference owed Commissioner of OWCP rather than Benefits Review Board).

of the Americas port of entry. When questioned during the hearing, Robinson testified that Rosendo had said he entered by "walking up the sidewalk." A.R. 85. At another point, Robinson testified, "I asked them. I asked the respondents specifically the mode or the manner which he entered the country and he claimed he entered through the bridge of the Americas port of entry on the west sidewalk. That's what he told me." A.R. 47. Rosendo argues that this answer indicates that Agent Robinson's testimony was both internally inconsistent, and that the information about Rosendo's entry came from numerous people ("them," "respondents").

But Robinson's testimony diverges only very slightly from the I-213. His use of mixed pronouns when testifying about who told him of Rosendo's entry shows confusion, but does not convince us that the BIA erred in finding the I-213 probative of unlawful entry. The I-213 was obviously carelessly drafted, and given the weight the statement carries in an alien's deportation proceedings, we believe that government officials ought to be able to convey their findings in a less cursory fashion. But nonetheless, we cannot conclude from the I-213's sloppiness and Agent Robinson's testimony that the I-213 was obviously incredible. Although the shortcomings of the document might in the first instance raise eyebrows, they do not "compel the conclusion" that the I-213 was unreliable, and therefore we must affirm the decision of the IJ that the I-213 was proper-

ly admissible as proof of Rosendo's entry into the United States.

## II. *Proof of Deportability*

Rosendo argues that, even with the I-213 admitted into evidence, the INS did not meet its burden of proving deportability by "clear, convincing and unequivocal" evidence. *Woodby*, 385 U.S. at 286, 87 S.Ct. at 488. Rosendo has conceded alienage throughout the proceedings; the only question is whether he entered the country without inspection.[4] He argues that neither the I-213 nor Agent Robinson's testimony unequivocally establish that he crossed the border without inspection. But if the factfinder found the I-213 a credible statement, and believed Agent Robinson's testimony, there was sufficient evidence to conclude that Rosendo had entered the United States without inspection. Rosendo argues that the I-213 only states that he crossed the Bridge of Americas on the west side (apparently walking against traffic). The I-213 does not indicate whether he stopped for inspection; nor did Agent Robinson testify that he asked Rosendo whether he had been inspected. But Robinson testified that walking up the west side of the bridge is proof that Rosendo was never inspected since there are no inspectors on that side of the bridge—or in other words, an admission of walking up the west side of the Bridge of Americas is an admission of entry without inspection. Moreover, according to the I-213, Rosendo had said he had left his alien registration

---

4. After addressing Rosendo's claim on the merits, the INS argues that Rosendo mischaracterized the INS' burden of proof. In a deportation for entry without inspection, the INS usually need only establish identity and alienage. The burden then shifts to the alien to prove the time, place and manner of his entry. 8 U.S.C. § 1361; *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1039, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984). The INS argues that it met its burden of proof when Rosendo conceded alienage, and that Rosendo was required to prove time, place and manner of entry. But when the alien is a lawful permanent resident, the BIA follows the practice of shifting the burden of proof from the alien to the government. *See Landon v. Plasencia*, 459 U.S. 21, 35, 103 S.Ct. 321, 330–31, 74 L.Ed.2d 21 (1982); *Matter of Huang*, 19 I & N Dec. 749 (BIA 1988); *Matter of Abdoulin*, 17 I & N Dec. 458, 460 (BIA 1980); *Matter of Kane*, 15 I & N Dec. 258, 264

(BIA 1975). Rosendo's concession of alienage was also proof of lawful entry into the country (as opposed to re-entry), and therefore could not be *prima facie* proof of deportability. *See Sherman v. INS*, 350 F.2d 894, 895 & n. 1 (2d Cir.1965), *rev'd on other grounds*, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966). In any event, we do not need to reach the question of the applicability of the § 1361 presumption, since the INS did not rely on it but rather argued the merits of the case. "The Government 'undertook to show affirmatively' that the petitioner had entered the United States ... without inspection. Once the Government chose to proceed in this manner established rules of evidence instruct us that it assumed the burden of persuasion on this issue; that is, the Government assumed the burden of proving the existence of the facts which impose the legal consequences the Government sought to invoke." *Id.* at 895.

card in Mexico; he therefore would have been unable to present it at the border. The evidence is only "equivocal" if the I–213 and Robinson are not credible; but we cannot conclude that the BIA erred in finding the evidence credible and, accordingly, in finding sufficient evidence that Rosendo had entered the country without inspection.

### III. *The* Fleuti *Doctrine and Choice of Law*

■ Although the INS established that Rosendo crossed the border without inspection, the parties quarrel over one of immigration law's more notable legal fictions—whether the border crossing constituted an "entry" for immigration purposes. Although an alien is usually deemed to have "entered" the United States upon physically crossing the border, a lawful permanent resident returning to the United States from another country does not legally "enter" under circumstances where he left the United States without intending to "meaningfully interrupt" his residency in the United States (perhaps, for example, to go shopping). INA § 101(a)(13), 8 U.S.C. § 1101(a)(13) (1988); *Rosenberg v. Fleuti,* 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963); cf. *Yuen Sang Low v. Attorney General,* 479 F.2d 820, 821 (9th Cir.), *cert. denied,* 414 U.S. 1039, 94 S.Ct. 539, 38 L.Ed.2d 330 (1973) ("We are in the never-never land of the Immigration and Nationality Act, where plain words do not always mean what they say."). In *Fleuti,* the Supreme Court held that a permanent resident who takes an "innocent, casual and brief excursion" abroad will not be deemed to have intended to disrupt his residency. 374 U.S. at 462, 83 S.Ct. at 1812. Such an alien

cannot be deported for entering without inspection because he never "entered" the United States.

The BIA found that Rosendo spent 5 months in Mexico before returning in April 1989, and that he had intended to bring his undocumented wife to the United States. The BIA concluded from these factors that Rosendo's visit to Mexico was not "brief, casual or innocent," and that it meaningfully interrupted his residency in the United States. Thus *Fleuti* offered no relief, and Rosendo was deemed to have "entered" the United States and could be deported for entering without inspection. *Laredo–Miranda v. INS,* 555 F.2d 1242, 1245 (5th Cir. 1977). On appeal, both Rosendo and the INS dispute whether the BIA erred when it found that Rosendo's excursion was neither innocent, casual nor brief, and that *Fleuti* did not shield him from the consequences of entry.

Their arguments, however, are misplaced. The BIA held, "in the Fifth Circuit, in which this case falls, a resident alien who crosses the border without inspection is not thereby deportable unless the crossing constitutes an entry within the meaning of ... *Fleuti.*" While this is a correct statement of Fifth Circuit law, *Laredo–Miranda v. INS,* 555 F.2d at 1245, the Seventh Circuit recently adopted a very different rule. In *Leal–Rodriguez v. INS,* 990 F.2d 939 (7th Cir.1993), we held that the *Fleuti* doctrine does not apply to a permanent resident who, having left the United States for whatever reason or duration, crosses the border without inspection upon return and is now threatened with deportation for entry without inspection. *Id.* at 948.[5] Under the restrictive rule of *Leal–*

5. Although in *Leal–Rodriguez* we considered this issue to be one of first impression, it can be read to be in some tension with cases arising in the Fifth Circuit (a point relevant here, since the BIA cited the Fifth Circuit law in its decision in this case). In *Yanez–Jacquez v. INS,* 440 F.2d 701 (5th Cir.1971), the Fifth Circuit held that a permanent resident alien had not "entered" the United States under *Fleuti* when he entered without inspection. In *Laredo–Miranda v. INS,* 555 F.2d at 1244–45, the Fifth Circuit explicitly rejected the holding later adopted by us in *Leal–Rodriguez:* "At oral argument the INS urged us to adopt a rule that any resident alien who crosses into the United States without presenting him-

self at a border checkpoint makes an 'entry' and subjects himself to deportation. Although we are sensitive to the problems faced by those who seek to enforce the immigration laws, and do not doubt the utility of such a rule to their work, *Yanez–Jacquez* binds us to a less rigorous interpretation of the Act. The INS's proposal could only be adopted by the *en banc* court, the Supreme Court, or Congress." *Id.* at 1245 n. 6. In *Leal–Rodriguez,* we distinguished *Yanez–Jacquez* by noting that the alien there was subject to deportation for committing a crime, whereas *Leal–Rodriguez* is limited to deportations for entry without inspection. 990 F.2d at 947–48. The dissent in *Leal–Rodriguez* took issue with this

*Rodriguez,* once it was shown that Rosendo walked across the border without inspection, he had "entered" the country and was deportable for entry without inspection. Since, in this circuit, *Fleuti* apparently does not even come into play in these circumstances, Rosendo's arguments about the nature of his excursion and entry are beside the point.

█ It should be apparent that this might raise an unusual question upon appellate review. Usually, a lower court applies the law of the court that will review its decision. Both the Immigration Judge, sitting in the Fifth Circuit, and the BIA decided Rosendo's case in accordance with Fifth Circuit law; but since the petition for review has come before this circuit, we review the BIA decision according to Seventh Circuit law. Surprisingly, the INA allows, and in some circumstances requires, this result. Although the BIA seeks uniform nationwide interpretation of the immigration laws, it considers itself bound by the law of the circuit in which the administrative proceedings were held. *Matter of Gonzalez,* 16 I. & N. Dec. 134, 135–36 (BIA 1977); *Matter of Waldei,* Int.Dec. 2981 (BIA Oct. 30, 1984). Thus the BIA decisions may be based explicitly on one circuit's law. But the INA provides that venue for a petition for review of a BIA decision lies either in the circuit in which the administrative proceedings were held (in this case, the Fifth Circuit) or in the circuit in which the petitioner resides (the Seventh). INA § 106(a), 8 U.S.C. § 1105a(a)(2). Thus we find ourselves in the uncommon position of being the first tribunal to apply what turns out to be the definitive law to the petitioner's claim.

Both the INS and Rosendo (at oral argument) advocate the same solution to this quandary: apply the Fifth Circuit law. The INS argues, no doubt correctly, that this would result in a more orderly application of the immigration laws. National uniformity in the immigration and naturalization laws is paramount: rarely is the vision of a unitary nation so pronounced as in the laws that determine who may cross our national bor-

ders and who may become a citizen. *See Jaramillo,* 1 F.3d at 1155. The BIA cannot achieve its goal of uniform application of the laws when the circuits are split and its decisions are subject to review potentially in any circuit. *See In re Cerna,* No. A–30257519, slip op. at 10 (BIA Oct. 7, 1991) (Appendix). But neither party has pointed to, and we have not found, a prior case in which we have "applied" the law of another circuit in order to ensure national uniformity. Clearly, we are not bound by Fifth Circuit law; the only interesting question is whether we might choose to follow the Fifth Circuit rather than our own precedent—or in effect, create a common law federal choice of law rule to satisfy our concerns for uniformity, given the venue provision at hand.

The only case we have found to confront this situation treated it somewhat like a federal choice of law question. In *Maldonado–Cruz v. INS,* 883 F.2d 788 (9th Cir.1989), Juan Maldonado, a California resident, petitioned the Ninth Circuit for review of a BIA decision rendered in accordance with Fifth Circuit law. *Id.* at 790. The Ninth Circuit acknowledged that venue was proper, but questioned what circuit's law should apply. Looking to a truncated list of traditional choice of law criteria, such as the alien's contacts with the two circuits (as here, the petitioner had lived in one circuit prior to his apprehension and had resided there since release from INS custody), the Ninth Circuit held that Ninth Circuit law applied. *Id.*

But even if we were to find choice of law principles useful—and their relevance in the context of sister circuits rather than separate sovereign states is dubious at best—a rule by which we applied the law of the circuit in which the administrative proceedings were held would only ensure that the IJ, the BIA and the court of appeals were all reviewing the same body of law. It would not, however, necessarily increase uniformity in the application of the immigration laws since cases that arose entirely in the Seventh Circuit would still be reviewed under Seventh Circuit law.

form of analysis, observing that *"Fleuti* governs all immigration law on entries because it interprets the definition of 'entry.' " 990 F.2d at 953.

But the parties here have not argued the continued vitality of *Leal–Rodriguez,* instead suggesting that we "apply" the Fifth Circuit's law.

The INS argues that we should apply the law of the circuit in which the administrative proceedings were held to prevent forum-shopping by aliens. But this concern cuts two ways: the INS can forum-shop too, and indeed may there have the upper hand. Since the INS has the authority to detain aliens in circuits other than the one in which they were apprehended, 8 U.S.C. § 1252, the INS may establish venue in its chosen circuit by transferring an alien to a remote detention site and instigating administrative proceedings in that circuit. 8 C.F.R. § 3.20(a) (venue for administrative proceedings lies in office in which INS files charging document); see, e.g., Maldonado–Cruz, 883 F.2d at 788 (alien arrested in Reno, detained and subjected to administrative proceedings in Oakdale, Louisiana, then transferred to detention facility in El Paso); Rios–Berrios v. INS, 776 F.2d 859, 863 (9th Cir.1985) (alien arrested in Los Angeles, detained and subjected to administrative proceedings in Florida). Since immigration judges will only grant motions for a change of venue upon a showing of "good cause," 8 C.F.R. § 3.20(b); Matter of Rahman, Int.Dec. 3174 (BIA May 12, 1992), the INS largely controls venue and thus the applicable law. But we need not fully consider the import of such practices here, since neither party appears to have engaged in forum-shopping (indeed, Rosendo has shopped in the forum least favorable to his claim).

Other agencies charged with administering national programs face similar difficulties maintaining uniform interpretations of their laws in the face of disunity in the circuit courts that review their decisions. See Peter L. Strauss, One Hundred Fifty Cases Per Year: Some Implications of the Supreme Court's Limited Resources for Judicial Review of Agency Action, 87 Colum.L.Rev. 1093, 1105–16 (1987). The Tax Court, for example, clearly seeks uniform national interpretation of the Internal Revenue Code; its judgments are reviewed in regional courts of appeals, creating the possibility that taxes may vary across the circuits. 26 U.S.C. § 7482(b). The Tax Court, like the INS, generally follows the law of the circuit in which the claim arose, and relies on a general self-correcting process to even out differences. Golsen v. Commissioner, 1970 WL 2191, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir.), cert. denied, 404 U.S. 940, 92 S.Ct. 284, 30 L.Ed.2d 254 (1971); see also Strauss, One Hundred Fifty Cases, at 1109–10; Samuel Estreicher and Richard Revesz, Nonacquiescence by Federal Administrative Agencies, 98 Yale L.J. 679, 713–14 (1989). Likewise, the Social Security Administration seeks consistent application of the disability laws, although its decisions are reviewed by geographically diverse circuits. See Estreicher & Revesz, Nonacquiescence, at 692–99.

But the SSA and the Tax Court have the advantage of knowing which court of appeals will review a given decision; the venue provisions of the INA offer the BIA less predictability. This is a quandary the BIA shares with the NLRB: under the NLRA, petitions for review of Board decisions may be brought in any circuit in which the unfair labor practice occurred, or where the company is located or conducts business, or in the D.C. Circuit. 29 U.S.C. § 160(e)–(f). Thus the labor laws have given rise to cases akin to Rosendo's, in that the lower court and the reviewing court applied different bodies of law. For example, in both Yellow Taxi Co. of Minneapolis v. NLRB, 721 F.2d 366 (D.C.Cir.1983) and Fiber Glass Systems, Inc. v. NLRB, 807 F.2d 461 (5th Cir.1987), the respective courts of appeals chastised the NLRB for failing to apply the law of the reviewing circuit, when there was no reason for the NLRB to know that their decisions would be reviewed by the chastising circuit. Yellow Taxi, 721 F.2d at 381–83; Fiber Glass, 807 F.2d at 463. Judge MacKinnon's harsh criticism of the Board in Yellow Taxi prompted a short concurrence by Judge Bork precisely on this point, noting that "an agency with nationwide jurisdiction is not required to conform to every interpretation given a statute by a court of appeals." 721 F.2d at 385. But note that none of these opinions have suggested that an appellate court would apply any law other than its own. See Int'l Brotherhood of Elec. Workers Local 474 v. NLRB, 814 F.2d 697, 717 (D.C.Cir.1987) (requiring Board to apply D.C.Circuit law to case arising in Tennessee);

see also *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 177–80, 104 S.Ct. 575, 582–83, 78 L.Ed.2d 388 (1984) (White, J., concurring) (integrity of the law of the circuit); *but cf.* Rebecca Hanner White, *Time For a New Approach: Why the Judiciary Should Disregard the 'Law of the Circuit' When Confronting Nonacquiescence by the National Labor Relations Board,* 69 N.C.L.Rev. 639, 671–84 (1991).

But although the venue-uncertain provisions of the INA and NLRA require both agencies to adjudicate without knowing which circuit will review their decisions, the NLRB has dealt with this uncertainty in a manner that, unlike the INS, diminishes the likelihood that one circuit will have to review the agency's application of another circuit's law. As noted above, Immigration Judges apply the law of the circuit in which they sit. *Matter of Waldei,* 16 I & N at 135. The NLRB, however, instructs ALJs to apply NLRB precedent rather than (potentially adverse) circuit law; upon review, the NLRB decides whether it chooses to acquiesce in a circuit's ruling. *Insurance Agents Int'l Union,* 119 N.L.R.B. 768, *enforcement denied,* 260 F.2d 736 (D.C.Cir.1958), *aff'd,* 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). "Only by such recognition of the legal authority of Board precedent will a uniform and orderly administration of a national act ... be achieved." *Id.* Since the ALJs justify their orders on the grounds of Board precedent rather than the laws of a particular circuit, the reviewing court is not asked to review another circuit's law.

The more controversial element of the NLRB's scheme, of course, is the Board's policy of nonacquiescence. *See, e.g.,* Estreicher & Revesz, *Nonacquiescence,* at 705–12. The interesting point for our purposes is that the NLRB defends its nonacquiescence policy as a function of its venue provisions. *Arvin Automotive v. NLRB,* 285 N.L.R.B. 753 (1987). Although the Board may exercise some control over the choice of forum in which to enforce an order, the ALJs have no such capability of prediction about the ultimate court of review and the parties themselves may seek enforcement in their own circuit. The Board discussed this issue at

length in *Arvin Automotive,* concluding "it is thus apparent that we operate under a statute that simply does not contemplate that the law of a single circuit would exclusively apply in a given case." *Arvin Automotive,* 285 N.L.R.B. at 21. *See also* Steven P. Eichel, *Respectful Disagreement: Nonacquiescence by Federal Administrative Agencies in United States Court of Appeals Precedents,* 18 Colum.J.L. & Soc.Probs. 463, 490–501 (1985) (nonacquiescence and venue uncertainty); Estreicher & Revesz, *Nonacquiescence,* at 741, 764–70. *Arvin Automotives* also flagged the relationship between nonacquiescence and the "choice of law" issue facing us today. In his dissent advocating that the Board cease its policy of nonacquiescence, Chairman Dotson noted that acquiescence in conflicting rulings could result in a circuit court's reviewing a decision taken in accordance with another circuit's law, but that untangling such a mess is best left to the courts. 285 N.L.R.B. at 42 & n. 25. The majority noted that Chairman Dotson's approach would not achieve his goal of uniformity, since "it is highly unlikely that the District of Columbia Circuit would apply the law of the Eleventh Circuit on review of the Order." *Id.* at 23 n. 27 (discussing *IBEW Local 474,* 814 F.2d at 697).

Perhaps this suggests that the BIA could take cues from the NLRB, requiring IJs to decide cases according to BIA precedent only, while the BIA decides upon review whether it wishes to acquiesce to a circuit's precedent. We could even interpret the INS' stance in this case as an inartful (or maybe in fact cleverly disguised) attempt at nonacquiescence to our rule in *Leal–Rodriguez.* After all, the INS grounds its argument that we should apply the law of the Fifth Circuit in concern for "the orderly review of Board decisions," just as the NLRB justifies nonacquiescence before courts of appeals. But we decline to infer such an INS policy here, given that agency's general policy of intracircuit acquiescence and the relative novelty of this situation. Moreover, we are loathe to recommend that an agency consider a nonacquiescence policy—at a minimum, the examples from the NLRB (not to mention the SSA in the early 1980s) make

clear that such a policy can frequently make matters more difficult.

In the end, the venue provisions of the INA seem to require the BIA to live with uncertainty of which court may review its decisions, and us to live with the strange situation of being asked to review a case that has applied another circuit's law. Moreover, the remedy suggested by some commentators—amending venue provisions to provide for certainty—might have peculiar ramifications in the immigration context (given, as noted above, the INS' custody over the petitioner). But our laws already provide a mechanism to achieve the goal of uniform application of the immigration laws within the current framework: *Chevron,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694. *See* Strauss, *One Hundred Fifty Cases,* at 1117–35 for a full exposition of this argument. It is well established that we will defer to the BIA's reasonable interpretations of ambiguous provisions of the INA (and "entry" is at best ambiguous). *Zalega,* 916 F.2d at 1259; *Mendoza v. INS,* 16 F.3d 335, 337 (9th Cir. 1994). *Chevron* deference should result in more uniform interpretation of the immigration laws among the circuit courts. In *Leal–Rodriguez,* we acknowledged the importance of deferring to a reasonable agency position, and pointed to *Matter of Kolk,* 11 I & N. Dec. 103 (BIA 1965) to support our holding. 990 F.2d at 944–47. The dissent took issue with this interpretation of the Board's position, noting that the Board itself has not followed *Kolk.* 990 F.2d at 953–54. But the heart of the analysis in *Leal–Rodriguez* seems to diminish *Chevron* 's weight: "Ultimately, it does not matter whether we defer to the BIA's interpretation of INA § 101, because we do not believe, as a matter of first principles, that the *Fleuti* doctrine applies to the case of an alien deportable for entering the United States without inspection." *Id.* at 946. This "first principles" analysis may in part explain the divergence between our case law and the BIA's position below and the INS' position in the litigation before us.

**6.** It is, of course, dubious in any event whether Rosendo could prevail under *Fleuti* or Fifth Cir-

We nonetheless believe we are obliged to review the BIA's decision in accordance with our own law, which holds that Rosendo cannot avail himself of the *Fleuti* doctrine. In this particular case, we do not consider it necessary to remand to the Board for application of our law. Once the Board has found that Rosendo entered the country, "it is clear what the agency decision has to be." *Osmani v. INS,* 14 F.3d 13, 15 (7th Cir.1994); but see *IBEW Local 474 v. NLRB,* 814 F.2d at 717 (*SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), requires remand for consideration under D.C.Circuit law).[6] The petition for review is

DENIED.